[No. B160274. Second Dist., Div. Three. Aug. 12, 2004.]

DANIEL HUFFMAN, Plaintiff and Appellant, v.
INTERSTATE BRANDS CORPORATION, INC., et al., Defendants and
Appellants.

682

COUNSEL

Paul, Hastings, Janofsky & Walker, J. Al Latham, Jr., Patricia M. Berry and Elizabeth A. Falcone for Defendants and Appellants.

Mathews & Rager, Charles T. Mathews, Jeffrey A. Rager; Law Offices of Roxanne Huddleston and Roxanne Huddleston for Plaintiff and Appellant.

OPINION

**CROSKEY, Acting P. J.**—In this case, we must determine whether an industrial injury subsequent to an alleged unlawful demotion is exempt from the exclusivity provisions of the Workers' Compensation Act (WCA) (Lab. Code, §§ 3600, 3602). Interstate Brands Corporation, Inc. (IBC),[1] and its employee Daniel Huffman (Huffman), each appeal from a judgment after a jury awarded Huffman more than $2 million in noneconomic damages after it had found that IBC had unlawfully demoted him from a district sales manager to a division sales manager. The damages awarded included the emotional distress Huffman suffered after his demotion when he injured his knees, which ultimately required that he undergo bilateral knee replacement surgery. Although both parties also raise instructional errors, we are principally concerned here with IBC's challenge to the admission of the evidence related to Huffman's postdemotion knee injury. The trial court concluded that such evidence was admissible to show the emotional distress Huffman suffered following the demotion because the causal chain following the discriminatory act had not been broken. We conclude that the trial court erred in admitting this evidence because it applied an incorrect "but for" standard, that is, but for the demotion, or unlawful act, Huffman would not have suffered emotional distress arising from his subsequent industrial injury. Such a test is an unwarranted expansion of the exemption to the WCA's exclusive remedy provisions. As shall be discussed, we conclude that the trial court

---

[1] IBC was erroneously sued as Interstate Brands Companies.

should have applied the traditional tort "substantial factor" test in determining whether the unlawful or discriminatory demotion was a substantial factor in causing the emotional distress arising from Huffman's postdemotion knee injury. Applying this test, we conclude that the evidence of Huffman's knee injury and consequent emotional distress should have been excluded. We further find instructional error in reversing the burden of proof on IBC's reasons for the demotion. Because these errors individually or cumulatively were prejudicial, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 1999, IBC demoted Huffman, a 23-year employee and district sales manager, two steps down to a division sales manager. Huffman's salary decreased, he went from a management position to a union position, and he lost management-type benefits that included, for example, the use of a company car. Huffman was 51 years old when he was demoted and claimed that he had been demoted because of his age. Huffman filed suit against IBC and his immediate supervisors. The supervisors were later dismissed, and Huffman proceeded to trial on his claims against IBC for age discrimination in violation of the Fair Employment and Housing Act (the FEHA) (§ 12900, et seq.) and wrongful demotion in violation of public policy. IBC maintained Huffman's demotion was not age-related but rather based on unsatisfactory performance as a district sales manager. As the two principal issues in this appeal are (1) the burden of proof on IBC's proffered reasons for Huffman's demotion, and (2) the admission of evidence concerning Huffman's injury following his demotion, we set forth the testimony on those issues in some detail to determine whether or not the court's rulings, if erroneous, were prejudicial to IBC.

### 1. Huffman and His Employment History at IBC

Huffman worked for IBC's Pomona bakery (bakery), which makes and distributes bread products, including Wonder Bread, Home Pride bread, and DiCarlo bread. Huffman was part of the sales team that serviced IBC's customer base of grocery stores and institutional facilities such as military bases and schools. Huffman started working for a previous owner of the bakery in 1976 as a route sales representative. A route sales representative delivers the bread products and stocks the customers' shelves. Huffman was promoted through the sales and management ranks, and continued to work for the bakery when it changed ownership in 1985.

In 1995, IBC bought the bakery. Huffman was one of the bakery's district sales managers. As a district sales manager, Huffman was responsible for overseeing the sales of products in his district, servicing IBC's customers,

and implementing product promotions. Huffman supervised a team of division sales managers, who, in turn, managed the route sales representatives. Both the route sales representatives and the division sales managers are represented by a union. The sales team also includes account managers who are assigned to serve as the liaison between a customer, such as Ralphs or Vons, and IBC. Account managers, like the district sales managers, report directly to the bakery's general sales manager and are nonunion employees.

In 1995, Gary Schneider (Schneider) was the general sales manager and Huffman's immediate supervisor. In 1998, a year before IBC saw a change in the bakery's upper management, Schneider gave Huffman a negative performance review, rating him as "adequate" overall, the second lowest score on the performance appraisal scale. In the written portion of the appraisal, Schneider indicated that Huffman needed to improve on, among other things, service issues, follow-up and execution of bakery programs, and distribution of variety bread products.

### 2. *The Bakery Changed Leadership and Related Employment Actions*

In approximately January 1999, the upper management at the bakery changed. Mark Cooper (Cooper) became the general manager of the bakery. Cooper was then 41 years old. Cooper replaced Schneider, then 48, with Dennis Laughlin (Laughlin) who was about 40 years old. Laughlin became Huffman's direct supervisor. Laughlin, with Cooper's approval, decided to demote Huffman in September 1999.

### a. *Cooper Announced the Need to Improve Sales*

When Cooper and Laughlin first assumed their positions, they told the sales force that they intended to make changes to improve the bakery's overall sales performance. Huffman confirmed a change in management philosophy. Huffman testified: "Well, [it] started out with a meeting with us, and in that meeting he made reference to something to the effect that we as a sales department had not produced. We were not doing the job, and we needed to correct that, and . . . he made a statement like, something to this effect: This is going to be like a choo choo train going 100 miles an hour. And when it goes off and when it goes around the corner, some of you are not going to be able to hang on. It doesn't matter how long you have been with the company or what you have done with the company. We're starting over." Huffman acknowledged that Cooper's comments were motivated by a "downward spiral" in sales at the bakery.

Almost immediately, and for economic reasons, Cooper restructured the sales districts from five to four, thereby eliminating one of the district sales

manager's positions. John Barron's (Barron) position as a district sales manager was eliminated, and he became an account manager.

### b. *IBC Decision Makers' Reasons for Huffman's Demotion*

#### 1) *Laughlin Demoted Huffman Because of Customer Complaints and Failure to Execute the Bakery's Promotional Activities*

Laughlin, Huffman's immediate supervisor, testified that he demoted Huffman because of his lack of execution and follow through, and his argumentative attitude. Laughlin testified, for example, that he directed Huffman to make sure that Wal-Mart, one of its customers, received service five days a week. After numerous conversations with Huffman on this issue, Huffman failed to provide the requested service.

Laughlin also criticized Huffman because he did not participate in the bakery's promotional events, a key to Cooper's turnaround marketing strategy. For example, according to Laughlin, the bakery had a promotional event over Memorial Day weekend to sell their hamburger and hot dog buns at a reduced price. Huffman had been informed of the promotion six weeks before the event but did not order additional products and/or did not display the products for the promotion in many of the stores in his district. The following month, the bakery had another promotion at Lucky stores where it was given space at no cost to sell additional bread products. According to Laughlin, Huffman again neglected to order additional products to fill the free shelf space.

In August, the bakery launched a campaign to promote Wonder Bread. Laughlin went to check out the displays and found that Huffman's district did not have the promotional displays in several stores. The last straw, according to Laughlin, came later that month, when the bakery worked with Stater Brothers supermarket to promote the grand reopening of the stores it had acquired following the Albertsons and Lucky merger. For this promotional event, IBC bread products were featured in a front-end display in the supermarkets, in addition to the baked goods aisles. Laughlin testified that he walked into the stores in Huffman's district and there was no product on the shelves.

Laughlin also testified that he received numerous complaints about Huffman from IBC's account manager Chris Vukojevich (Vukojevich), who was in charge of the Ralphs supermarket account, and Rachel Williams (Williams), Ralphs's bakery merchandiser. Vukojevich also testified that Williams and Ralphs's store personnel complained to her that stores in Huffman's

district were often out of stock and/or had off-code products, meaning that bread had not been timely removed from the shelves. Vukojevich prepared numerous memoranda to Huffman raising her concerns and asked that he respond directly to Williams. In one such memoranda Vukojevich stated: "[Williams] needs to know, and have confidence in your abilities. . . . The recurring complaints . . . may jeopardize future presentations, and my results with Ralphs Bakery Director." Huffman never directly responded to Williams. In addition to Vukojevich, Leon Lee (Lee), IBC's account manager for Lucky stores, also had complaints about Huffman's failure to timely respond to customer complaints.

### 2) *Cooper Learned About Huffman's Performance Problems*

Cooper testified that beginning in February or March 1999, Laughlin began discussing with him Huffman's performance problems. Cooper recalled that Laughlin told him that Huffman was not responsive to customers' complaints and was not adequately executing the bakery's promotions. Cooper told Laughlin to document the specific performance issues, request corrective action, and state that failure to do so would endanger Huffman's job.

### c. *Huffman Claimed His Sales Figures Were Good and the Performance Issues Were a Pretext*

Huffman countered this testimony with evidence that his sales performance was good and that sales had stayed the same in his district under his supervision. Huffman took exception to criticism that he failed to execute when his sales remained constant, and produced weekly summaries of his sales activities to attack the testimony that he failed to respond to customers' complaints. Moreover, Huffman pointed out that Laughlin had prepared his performance appraisal earlier that year and did not mention any of the reasons that he now claimed were factors in his demotion.

Huffman directly attacked the written "paper trail" Laughlin created to document his unsatisfactory performance. For example, the written memorandum in which Laughlin criticized Huffman because he was not adequately servicing Wal-Mart supermarkets was addressed and distributed to all the district sales managers. Likewise, although Laughlin addressed a second memorandum on the same subject to Huffman, which identified the lack of execution on the Memorial Day promotion, Laughlin admitted that all the district managers received a memorandum addressing the promotional event and related service issues. Moreover, Laughlin continued to complain about the district sales managers' lack of execution long after Huffman had been removed from the position.

On the issue of failure to follow through with customer complaints, as noted, Huffman produced his weekly management reports that directly addressed steps he had taken to handle those complaints. Huffman also countered Vukojevich's testimony by addressing each of the customer complaints she had raised in her memoranda and by explaining how he had responded directly to her. Moreover, Vukojevich admitted that the problems described in Huffman's district occurred in all the districts but maintained that they occurred more frequently in Huffman's district.

Huffman also presented evidence that the problem in his district was too much shelf space, and that he had suggested that the bakery consider reducing that space in a number of stores. Laughlin would not agree to reduce space, but later did so after Huffman's demotion. Laughlin acknowledged that Huffman had raised the issue but did not recall the exact details of that recommendation.

Finally, Huffman presented testimony of subordinates who stated that they had no problems with Huffman's performance.

### 3. *Conflicting Evidence That Age Was the Reason for Huffman's Demotion*

Huffman attempted to show that upon IBC's takeover, the company began a "youth movement" to replace bakery management with younger employees. He pointed out that IBC offered a severance package for older workers. Huffman established that Cooper and Laughlin were younger than the men that they replaced. Cooper had replaced Jim Cook (Cook) who was in his mid-50's. Cook, however, testified that he had voluntarily retired. Laughlin, who was about 40, replaced Schneider who was then 48. Barron, Huffman's replacement, was 38 years old in September 1999. Barron, however, remained in that position for about four months before he returned to his account management position.

Huffman also testified that he believed Cooper and Laughlin had an age bias. Huffman believed that Cooper's remarks referring to the "choo choo train" in the first sales meeting in January 1999 were age related. Huffman also testified that during a meeting in which Cooper was discussing sales trends, he turned to Huffman and said, "Oh Huffman's been around forever. You['ve] seen that happen. You['ve] seen this [sales] trend." Laughlin reportedly told Huffman that "I need old guys like you around that have a lot of experience because I'm a new guy." Huffman also overheard Laughlin make ageist remarks about two other employees.

### 4. *Huffman Was Demoted to Division Sales Manager*

In September 1999, Huffman was demoted to the position of division sales manager. Both Cooper and Laughlin testified that they did not consider making Huffman an account manager. Cooper testified that they did not do so because there were no vacant positions, they had decided to eliminate the account manager position Barron had vacated, and they would not have considered Huffman to fill the account manager position for fear that they would run into the same problems that led to his demotion.

When Huffman was demoted, his base pay decreased. He returned to a union position, and IBC contributed to the union pension on his behalf.

During the meeting in which he was informed about the demotion, Huffman asked about a severance package. Cooper and Laughlin assured him that he was not being fired and was "too good of an employee to lose."

### 5. *Huffman Suffered an Industrial Injury Following His Demotion and Underwent Bilateral Knee Replacement Surgery*

Now as a division sales manager, Huffman had to load and deliver bakery products for delivery to stores. Over objection, Huffman introduced evidence of the injuries he suffered after his demotion to division sales manager.[2]

Huffman testified that his return to the position of division sales manager aggravated his preexisting knee injuries. Huffman admitted that he had injured his knees in the early 1980's while working as a route sales representative for IBC's predecessor, characterizing the injury as swelling in both knees. He did not report the injury until 1994 when he filed a workers' compensation claim. By that time, Huffman had undergone a total of five surgeries.

When he was demoted, Huffman testified that he told both Cooper and Laughlin that his bad knees prevented him from heavy pushing and lifting. Huffman acknowledged that he was offered a position in which he could work together with another division sales manager, but he did not consider

---

[2] IBC moved to exclude the evidence on the grounds that Huffman's exclusive remedy for such injury was under the WCA. The trial court disagreed, and concluded, based on *Jones v. Los Angeles Community College Dist.* (1988) 198 Cal.App.3d 794, 809 [244 Cal.Rptr. 37], that Huffman could testify regarding the humiliation and other injuries he suffered following his demotion. In reaching its conclusion, the trial court also relied on several cases that it reasoned stood for that proposition. (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 347 [21 Cal.Rptr.2d 292]; *B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 91–92 [9 Cal.Rptr.2d 894]; and *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 480 [4 Cal.Rptr.2d 522].)

that an option because he would still be required to do the physical work of a division sales manager in that position.

In the spring of 2000, Huffman sought medical treatment for his knees. In August 2000, he reported the problems to IBC. In 2001, he had bilateral knee replacement surgery and remains on medical leave.

Huffman's orthopedic surgeon, Steven Miculak, M.D., testified regarding the knee replacement surgery. Dr. Miculak opined that Huffman's knee problems were "accumulative trauma from the injury he sustained from October 1999 through August of 2000." Dr. Miculak, however, acknowledged that Huffman's knee problems were degenerative, and that his injury was an "exacerbation of arthritis."

In closing argument, Huffman's counsel repeatedly reminded the jury of Huffman's pain and suffering as a result of his knee injury. When addressing the issue of awarding damages, counsel argued: "You know, if we were just talking about a personal injury case and said, because of what the defendant did the plaintiff had to have both knees replaced, we'd be talking about a staggering amount of money in damages. Just to have your knees replaced, to have to walk around with titanium inserts into your knees." Later, Huffman's counsel argued that when the jury determined damages they should consider: "How much do you award for the physical injury and the emotional trauma that came from that [bilateral knee replacement surgery]? Under the jury instructions, consider that here's a guy who is now suddenly thrust into the hospital. Who's got both of his legs cut up and operated on. Yeah, he can walk around now, but, my God, you know darn well he's never going to be the same again."

### 6. The Jury Returned a Special Verdict in Favor of Huffman

The jury returned a special verdict against IBC and originally awarded Huffman $699,000 in economic damages and $2 million in noneconomic damages. Huffman received $2 million in noneconomic damages attributable to his emotional distress over the demotion and the pain and suffering he attributed to the knee injury and knee replacement surgery.

IBC moved for a new trial and judgment notwithstanding the verdict, and Huffman moved for attorney fees as the prevailing party. The trial court granted Huffman's attorney fees, denied the motion for judgment notwithstanding the verdict, but conditionally granted the motion for new trial subject to Huffman's consent to remittitur of the economic damages from

$699,000 to $155,600.[3] Huffman consented to the remittitur, and the court entered judgment reflecting the remittitur. Both parties timely appealed.

## THE PARTIES' CONTENTIONS

IBC contends that along with the erroneous admission of evidence, misstatements of the law in the jury instructions marred the trial and require reversal. One of the misstatements of the law involves a jury instruction that reversed the burden of proof, requiring IBC, and not Huffman, to establish by a preponderance of evidence that it had a legitimate reason for demoting Huffman. As noted, IBC also attacks the admission of Huffman's post-demotion industrial injury and contends that evidence was inadmissible because Huffman's exclusive remedy was under the WCA.[4]

Huffman also asserts instructional error, claiming the trial court erred in instructing the jury that as a matter of law Cooper was not a managing agent.[5]

## DISCUSSION

### 1. *Applicable Standards of Review*

■ The trial errors IBC raises require two different standards of review. In reviewing a claim of instructional error, we must " 'assume the jury

---

[3] In its opening brief, IBC pointed out, as it did in the trial court, that the order granting a new trial was procedurally deficient. Code of Civil Procedure section 657 requires that new trial orders state the grounds upon which the new trial is granted. That section also requires that the new trial order state the reasons supporting the grounds. These grounds must be included in the written order. IBC made numerous requests for a written order that complied with the statute, but Huffman's counsel argued against a written order. IBC preemptively raised the procedural defect and asked that we exercise our inherent power to correct the infirm order. Huffman, however, has abandoned his cross-appeal on the motion for new trial, stating: "We also must concede Huffman encouraged the court to forego the written specifications, for this reason, he has not raised the issue in his cross-appeal." We reject any notion that IBC's argument was a "challenge" to the motion for new trial order. Therefore, we conclude that any appeal of this issue has been abandoned, and we do not address the issue.

[4] Since we have concluded that both of these contentions are meritorious and should be resolved in IBC's favor, we need not address IBC's remaining two contentions, namely that the trial court erred by sua sponte modifying a jury instruction, and that the special verdict form contained an incorrect interrogatory that further compounded the instructional error on the applicable burden of proof.

[5] In light of our conclusion to remand for a new trial, we need not address whether the trial court erred by instructing the jury that Cooper was not a managing agent. The trial court apparently did so based on the testimony at trial. Because it is not clear that the exact issue will arise again on remand, we simply note that based on the record before us, the evidence was not sufficient to establish that Cooper was IBC's managing agent. (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 166–168 [99 Cal.Rptr.2d 435].)

might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]' " (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1152, fn. 2 [84 Cal.Rptr.2d 257], quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 773 [15 Cal.Rptr.2d 815].) Thus, the evidence must be viewed in the light most favorable to IBC. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353].)

■ Ordinarily, in reviewing the erroneous admission of evidence, we are guided by Evidence Code section 353, which provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].)

Here, however, the issue presented also deals with the application of the WCA to the facts supporting the verdict. Thus, our initial inquiry is a question of law, namely, whether under these facts, the exclusive remedy provision of the WCA does or does not bar the recovery of civil damages in this action. (*Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 710, 718–719 [112 Cal.Rptr.2d 195].)

### 2. The Trial Court Erred in Permitting the Admission of Evidence of Huffman's Postdemotion Industrial Injury Because Workers' Compensation Provides the Exclusive Remedy

IBC concedes that an unlawful demotion, such as the one the jury concluded occurred here, is not subject to workers' compensation exclusivity, but maintains that the pain and suffering Huffman attributed to his post-demotion knee injury is not exempt from the exclusivity provisions of the WCA, and the testimony and argument on those issues should have been excluded. We agree. As discussed below, we conclude, consistent with well-settled law, that emotional distress caused by IBC's allegedly unlawful decision to demote Huffman is recoverable in a civil action and exempt from the WCA exclusive remedy provisions. Emotional distress caused by a

subsequent work-related injury following an alleged discriminatory act, however, is not recoverable in a civil action unless the discriminatory act was a substantial factor in causing the subsequent injury.

### a. *The Exclusive Remedy Provisions in the WCA*

 Labor Code section 3600, subdivision (a),[6] provides that subject to certain exceptions and conditions, workers' compensation liability, "in lieu of any other liability whatsoever" will exist against an employer for any injury sustained by his or her employees arising out of and in the course of employment. Specifically, that statute provides in relevant part: "Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death, in those cases where the . . . conditions of compensation concur . . . ." (§ 3600, subd. (a).) The conditions of compensation that are applicable include: "(1) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division. [¶] (2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment. [¶] (3) Where the injury is proximately caused by the employment, either with or without negligence." (*Ibid.*)

Subdivision (a) of section 3602 then provides: "Where the conditions of compensation set forth in Section 3600 concur, the right to recover such compensation is . . . the sole and exclusive remedy of the employee . . . against the employer . . . ." Section 5300, subdivision (a) provides that proceedings "[f]or the recovery of compensation, or concerning any right or liability arising out of or incidental thereto" shall be "instituted before the [workers' compensation] appeals board and not elsewhere, except as otherwise provided in Division 4 . . . ."

The underlying purpose of these exclusivity provisions is the presumed " 'compensation bargain.' " (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16 [276 Cal.Rptr. 303, 801 P.2d 1054].) The bargain according to the *Shoemaker* court is that "the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort. [Citations.]" (*Ibid.*)

---

[6] Unless otherwise indicated, all further statutory references are to the Labor Code.

Certain types of injurious employer misconduct, however, remain outside the bargain. "There are some instances in which, although the injury arose in the course of employment, the employer engaging in'that conduct ' "stepped out of [its] proper role[]" ' or engaged in conduct of ' "questionable relationship to the employment." ' [Citations.]" (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 708 [30 Cal.Rptr.2d 18, 872 P.2d 559].)

### b. *The Scope of the WCA Exclusivity Provisions*

Huffman's position is that his subsequent injury following his alleged unlawful demotion was one of those instances in which the employer acted outside of its proper role. The trial court agreed. It regarded the subsequent injury following Huffman's demotion as an injury flowing from the unlawful act and outside the compensation bargain. We disagree with the trial court's assessment of the nature of the subsequent injury. In resolving whether IBC's acts were within the scope of the exclusivity provisions, we are guided by the analytical framework employed by our Supreme Court in *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800 [102 Cal.Rptr.2d 562, 14 P.3d 234] (*Vacanti*).

In *Vacanti*, the Supreme Court stated that "[i]n determining whether exclusivity bars a cause of action against an employer or insurer, courts initially determine whether the alleged injury falls within the scope of the exclusive remedy provisions. Where the alleged injury is 'collateral to or derivative of' an injury compensable by the exclusive remedies of the WCA, a cause of action predicated on that injury may be subject to the exclusivity bar. [Citation.] Otherwise, the cause of action is not barred." (*Vacanti, supra,* 24 Cal.4th at p. 811; see also *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743] (*Cole*).)

"If the alleged injury falls within the scope of the exclusive remedy provisions, then courts must consider whether the alleged acts or motives that establish the elements of the cause of action fall outside the risks encompassed within the compensation bargain," making the injury exempt from the WCA exclusivity provisions. (*Vacanti, supra,* 24 Cal.4th at pp. 811–812; see also *Fermino v. Fedco, Inc., supra,* 7 Cal.4th at pp. 717–718.) Typical employer actions "such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances" do not by themselves exempt a cause of action from exclusive remedy provisions. (*Cole, supra,* 43 Cal.3d at p. 160; *Fermino v. Fedco, Inc., supra,* at pp. 717–718.) As *Cole* instructs: "If characterization of conduct normally occurring in the workplace as unfair or outrageous were sufficient to avoid the exclusive remedy provisions of the Labor Code, the exception would permit the employee to allege a cause of action in every case where he suffered mental disability

merely by alleging an ulterior purpose of causing injury. Such an exception would be contrary to the compensation bargain and unfair to the employer." (*Cole*, supra, at p. 160.)

Employer actions that violate a fundamental public policy, however, are exempt from the exclusive remedy provisions of the WCA because they "cannot under any reasonable viewpoint be considered a 'normal part of the employment relationship.' " (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1100 [4 Cal.Rptr.2d 874, 824 P.2d 680], overruled on other grounds in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046]; see also *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1154–1155 [77 Cal.Rptr.2d 445, 959 P.2d 752].)[7] With these principles in mind, we must determine the scope of the exclusive remedy provisions of the WCA when a subsequent workplace injury follows an allegedly unlawful demotion that is concededly outside the compensation bargain.[8] Like the *Vacanti* court, we are presented with a new "twist" in determining the scope of the exclusivity provision when two acts, one of which is exempt from the exclusivity provisions, might be the cause of the alleged injury.

### c. *The Exclusivity Provisions Apply Unless the Unlawful Employment Action Was a Substantial Factor in the Subsequent Injury*

Because this case is the first to address this issue, both parties have proposed a test to determine whether the exclusive remedy provisions apply to a subsequent workplace injury incurred while carrying out the duties of a position in which the employee was placed for an alleged discriminatory reason. IBC proposes that we adopt a direct causation test. Its position is the two acts are separate, and that while the allegedly discriminatory one is exempt from the exclusivity provisions, the second act, in this case, assigning Huffman to perform normal job duties which caused his subsequent knee injury, is not exempt from the exclusivity provisions. According to IBC, in order for the subsequent industrial injury to be exempt, the injury must be directly caused by the unlawful act. Huffman counters that the "but for" test

---

[7] In his opposition, Huffman cites several cases for the proposition that FEHA claims are exempt from the exclusivity provisions. That issue is well settled. The issue here is whether, and to what extent, a work-related injury following a discriminatory employment action is also barred by the exclusivity provision.

[8] We are not concerned here with whether Huffman's demotion is governed by the exclusive remedy provisions. The jury found that the motive for Huffman's demotion was age discrimination, taking it outside the scope of the compensation bargain. Accordingly, IBC concedes that the emotional distress caused by IBC's decision to demote Huffman would be recoverable in a civil action. Likewise, we are not concerned with whether Huffman's subsequent injury was work related. That point also is conceded.

employed by the trial court is the correct one because the two acts (i.e., the demotion and subsequent injury) should be viewed as a "continuing injury" flowing from the allegedly discriminatory act, which falls outside the compensation bargain. Thus, Huffman proposes a rule that would exempt all subsequent injuries from workers' compensation exclusivity because the employee in that position initially was placed there for an unlawful reason. Where, as here, there might be two or more reasonable causes for the subsequent injury, we reject both parties' proposed tests in favor of the traditional tort "substantial factor" test.

 We conclude that the better approach to determine whether the exclusivity provisions apply to a subsequent injury following an unlawful act, such as a discriminatory demotion, is to determine whether the discriminatory conduct (i.e., the demotion) was a substantial factor in the subsequent industrial injury. We do not attempt to define the word "substantial" but note that the conduct must have an effect in producing the injury or harm to regard it as a cause and that it must be more than slight, theoretical, trivial, or negligible to be a substantial factor.[9] " 'If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries.' [Citation.]" (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052 [1 Cal.Rptr.2d 913, 819 P.2d 872].)

"Not only does the substantial factor instruction assist in the resolution of the problem of independent causes . . . but '[i]t aids in the disposition . . . of two other types of situations which have proved troublesome. One is that where a similar, but not identical result would have followed without the defendant's act; the other where one defendant has made a clearly proved but quite insignificant contribution to the result, as where he throws a lighted match into a forest fire. But, in the great majority of cases, *it produces the same legal conclusion as the but-for test*. Except in the classes of cases indicated, no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it; nor will cases very often arise where it would not be such a factor when it was so indispensable a cause that without it the result would not have followed.' [Citation.]" (*Mitchell v. Gonzales, supra*, 54 Cal.3d at pp. 1052–1053.)

---

[9] BAJI No. 3.76, the substantial factor jury instruction, provides: "The law defines cause in its own particular way. A cause of [injury] [damage] [loss] [or] [harm] is something that is a substantial factor in bringing about an [injury] [damage] [loss] [or] [harm]." A related instruction adopted by the Judicial Council in 2003 provides: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." (BAJI No. 4.30.)

An example will illustrate the application of the substantial factor test we articulate here to determine whether the exclusivity provisions apply where two independent causes might contribute to the subsequent injury. An applicant seeks a white-collar office job, but a discriminatory hiring decision puts him on the loading dock. While working on the loading dock, the employee is injured in a forklift accident. Although the discriminatory hiring decision caused the employee to be present on the loading dock, that decision was not a substantial factor in the industrial injury because it had nothing at all to do with the injury. The job itself (and not the reason he was assigned to the job) caused the injury.[10]

The trial court and Huffman both principally rely on *Jones v. Los Angeles Community College Dist., supra,* 198 Cal.App.3d 794, as the basis for supporting the proposition that *any* subsequent injury following an alleged discriminatory act is outside the compensation bargain. *Jones,* in our view, cannot be read in such a manner.

In *Jones,* the plaintiff claimed that he was the victim of racial discrimination. He suffered racial insults of his coworker and in retaliation for his complaints to his manager, his workload increased, he was given more oppressive deadlines, and he was singled out to be monitored at work, which he found very humiliating. (*Jones v. Los Angeles Community College Dist., supra,* 198 Cal.App.3d at p. 800.) During this period, Jones sustained an injury to his left knee that caused him to remain disabled and unable to return to work. (*Id.* at pp. 801–802.)

The trial court granted summary adjudication of Jones's discrimination claims because those claims were barred by workers' compensation exclusivity. (*Jones v. Los Angeles Community College Dist., supra,* 198 Cal.App.3d at pp. 803–804.) The Court of Appeal reversed. It concluded that statutory discrimination claims are exempt from the workers' compensation exclusivity. (*Id.* at pp. 807–809.) As the court reasoned, "the application of the exclusivity provision of the Labor Code would in effect result in no recognition of or compensation for the humiliation and other injuries which Jones suffered before his knee injury." (*Id.* at p. 809.) This case goes no further and

---

[10] We agree with IBC that this hypothetical closely resembles the facts of this case. Huffman's attempt to distinguish this hypothetical misses the mark. He states: "Suppose a loading dock manager who harbors racial animus uses a forklift to break the knees of a minority employee, hoping to make him quit." This does not accurately address the issue raised here, nor does it aid in our analysis. It is not part of the normal employment relationship to be physically attacked by a coworker. The issue here is when the chain of causation stops following an alleged discriminatory employment decision that places an employee in a certain position, and the employee thereafter suffers a work-related injury while carrying out the duties of that position.

we cannot read it as the trial court did, that is, for the proposition that *any* subsequent work-related injury following a discriminatory act is exempt from the workers' compensation exclusivity provisions.[11] In sum, we conclude that in order to be exempt from the exclusive remedy provisions of the WCA the unlawful act must be a substantial factor in the subsequent injury.

### d. *Huffman's Injury Is Subject to the Exclusive Remedy Provision*

■ Applying the substantial factor test here, we conclude that Huffman's alleged unlawful demotion was not a substantial factor in his subsequent knee injury. We begin by emphasizing that Huffman alleged, and the jury believed, that IBC unlawfully demoted him because of his age. Had Huffman alleged a disability discrimination or failure-to-accommodate claim, there is no doubt that his emotional distress damages arising from his knee injury would have been exempt from the exclusive remedy provisions. In such a case, unlike the one presented, the unlawful demotion to a position in which the employer knew the employee could not perform because of a physical disability would be a substantial factor in subsequent workplace injury sustained by that employee while attempting to perform his or her job duties. We emphasize that is not the situation here. Huffman claimed, and the jury believed, that he had been demoted because of his age and replaced by a younger man. Although Huffman told Cooper and Laughlin that he could not meet the physical requirements of a division sales manager, he assumed that position and performed that job until the spring of 2000. Huffman then sought medical attention for his knee injury and in August 2000, he reported the injury to IBC. The injury Huffman sustained was because of the physical requirements of the job, which all division sales managers were required to perform, not because he was unlawfully replaced as a district manager by a younger man. Thus, IBC's decision to demote Huffman was unrelated to the subsequent injury and not a substantial factor in that injury. Indeed, to conclude otherwise would unfairly penalize IBC for retaining Huffman as an employee in some position rather than terminating him. Accordingly, the exclusive remedy provisions apply.

We reject Huffman's argument that his physical injury was part of a plan of age discrimination. Huffman asserts that the evidence established IBC demoted him because of his age to a position it knew he could not perform so

---

[11] Likewise, the other cases the trial court relied on are inapposite. Those cases either involved a FEHA claim or a wrongful termination claim, which are clearly outside the compensation bargain. (*Accardi v. Superior Court, supra,* 17 Cal.App.4th at p. 347 [FEHA]; *B & E Convalescent Center v. State Compensation Ins. Fund, supra,* 8 Cal.App.4th at pp. 91–92 [FEHA and wrongful termination]; and *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 480 [FEHA].)

that he would either be injured (and leave) or quit. As IBC points out, this argument is flawed for the obvious reason that Huffman's discrimination claim was based on his age, not on any physical ability or inability to do the division sales manager job. There is no evidence that Huffman's knee problems were related to his age. Moreover, an age motive to place a younger man in Huffman's position (and thus demote Huffman) does not extend to performing the job duties that every other division manager was required to perform.[12] Indeed, Huffman's age discrimination complaint with the Department of Fair Employment and Housing (DFEH) was filed in September 1999, *long before* he suffered his knee injury while working as a division sales manager. We therefore conclude that the alleged discrimination Huffman suffered was separate from his subsequent industrial injury after assuming the position of division sales manager.

As we mentioned, although this case presents a new "twist" on the scope of the exclusivity provisions, we find the analysis no different than the one our Supreme Court employed in *Cole, supra,* 43 Cal.3d at page 160. Huffman was injured while performing his duties as a division sales manager. There is no evidence that these duties or responsibilities were assigned for an unlawful purpose. Thus, workers' compensation is Huffman's exclusive remedy and bars him from recovering civil damages in this action for pain and suffering connected to his knee injury.

Under Huffman's theory, whenever a discriminatory act occurs, any subsequent work-related injury is exempt from the workers' compensation exclusivity provisions. This theory would permit an employee to circumvent the workers' compensation system by asserting a discrimination claim even if the injury was unrelated and remote in time to the discriminatory conduct. This theory is contrary to the expressed purpose of the WCA and would significantly disturb the compensation bargain. Thus, for the reasons stated above, we conclude that the trial court erred in permitting evidence of Huffman's pain and suffering arising from the exacerbation of his knee injury two years after he was demoted.

▮ For the same reasons, we conclude that the evidence of Huffman's knee injury and bilateral knee replacement surgery was prejudicial, requiring a new trial. We need only look at Huffman's counsel's closing argument to conclude that this evidence was prejudicial. We note that the jury also heard from Huffman's psychiatrist that Huffman required psychotherapy, took antidepressant medication, and that the demotion diminished his self-confidence, and

---

[12] As IBC points out, the terms and conditions of Huffman's employment as a division sales manager could not constitute an age discrimination claim because at the time of these events, age discrimination with respect to working conditions was not covered by the FEHA (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 267–268 [121 Cal.Rptr.2d 203, 47 P.3d 1069]), and Huffman's harassment claim had been dismissed.

self-esteem. Huffman also testified of the financial difficulties he and his family faced, and the humiliation he experienced after his demotion. This evidence no doubt swayed the jury. Nevertheless, during argument, Huffman's counsel asked the jury to put a price on Huffman's two knees. This argument undoubtedly linked Huffman's pain and suffering stemming from the knee injury directly to his demotion. As we have stated, the post-demotion knee injury was separate and apart from replacing Huffman with a younger worker. We are satisfied that, had this evidence been excluded, there is a reasonable probability that the jury might have rendered a result more favorable to IBC.

### 3. The Trial Court Committed Prejudicial Instructional Error by Erroneously Reversing the Burden of Proof on Huffman's Age Discrimination Claim

The instructional error we address here prejudicially reversed the burden of proof on Huffman's age discrimination claim. Because of the nature of the error, and the fact that IBC did not propose the instruction or agree to it, as we shall discuss, this is not a case in which the invited error doctrine applies.

#### a. As Given, BAJI No. 2.60 Erroneously and Prejudicially Reversed the Burden of Proof

Before trial, both parties submitted BAJI No. 2.60 (Burden of Proof and Preponderance of Evidence), a "fill in the blank" instruction. IBC included it among a list of proposed jury instructions but did not include the proposed text of the instruction.[13] Huffman submitted a modified version of the instruction. At issue here is the following portion of the modified instruction Huffman submitted: "The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish that in demoting Dan Huffman its conduct was done in *good faith* and for *a proper business purpose*." (Italics added.)[14]

At the final hearing to determine the jury instructions, counsel discussed BAJI No. 2.60. IBC's counsel had previously objected to this instruction as

---

[13] In a pretrial meeting of counsel, IBC's counsel presented a text version which stated that plaintiff had the burden of proof based upon a preponderance of the evidence. That instruction referenced only Huffman's age discrimination claim. The court, however, rejected IBC's counsel's position that only Huffman's age discrimination claim should be tried. Huffman's proffered modified BAJI No. 2.60, the one given at trial, contained both causes of action.

[14] BAJI No. 2.60 as given stated: "Plaintiff is seeking damages based upon claims of age discrimination and wrongful demotion in breach of public policy.

"Plaintiff has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the essential elements of each separate claim. The essential elements of each separate claim are set forth elsewhere in these instructions. In addition to these essential

well as others Huffman proposed because it included causes of action for both a violation of the FEHA and for wrongful demotion in violation of public policy. IBC's counsel had asked the trial court to drop one of the claims on the grounds that they were duplicative, but the trial court denied the request. The court asked IBC's counsel if there were any remaining objections to Huffman's proffered instruction and IBC's counsel responded, "No."[15]

IBC's counsel later averred in the motion for new trial that he mistakenly believed that the only issue with the instruction was "the question of which causes of action would be included." The trial court, however, concluded that the invited error doctrine or the doctrine of estoppel applied.[16]

---

elements, plaintiff has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the nature and extent of the damages claimed to have been suffered, the elements of plaintiff's damage and the amount thereof.

*"The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish that in demoting Dan Huffman its conduct was done in good faith and for a proper business purpose.*

" 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to say that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it.

"You should consider all of the evidence bearing upon every issue regardless of who produced it." (Italics added.)

[15] Here is the exchange between counsel and the trial court concerning Huffman's proposed BAJI No. 2.60, which became jury instruction No. 23:

"The Court: Next is 2.60, 'burden of proof and preponderance of evidence.'

"The dispute is?

"Mr. Matthews [Huffman's counsel]: There was a series of our instructions that were disputed because we included both causes of action, and Mr. Kelly [IBC's counsel] and I have had this discussion before your honor ruled on whether both would go.

"The Court: Okay. Well, that discussion, then, by the time we had concluded, I think, resolved some of those concerns.

"Mr. Matthews: That's correct. Isn't it that—was your concern with our 2.60 that it also included wrongful demotion as well as age discrimination count?

"The Court: The question, Mr. Kelly is: Is there any objection remaining to 2.60 as requested by plaintiff?

"Mr. Kelly: No.

"The Court: Very well.

"Mr. Kelly: With the court's ruling."

[16] Before the ruling, IBC's counsel further stated that his error was inadvertent and that he would not have agreed to such an instruction that improperly gave IBC the burden of proof. The trial court appeared to accept this explanation. Nevertheless, the trial court reviewed the transcript, in conjunction with IBC's counsel's declaration, analogized the situation as akin to a contract between Huffman's counsel on his client's behalf and IBC's counsel on behalf of his client. IBC's counsel's mistake of fact did not make the contract voidable. As the court reasoned, relying on a legal treatise discussing contract law, mistake of fact is " 'not caused by the neglect of a legal duty on the part of the person making the mistake . . . .' " Moreover, the court invoked the invited error doctrine. It reasoned that IBC's counsel's "No" response to any further objection was, in effect, "a request that the court give [BAJI No.] 2.60." Later in its

## 1) *IBC Did Not Have the Burden of Proof*

■ BAJI No. 2.60 as given was wrong. A defendant does not carry the burden of persuasion in a discrimination case. (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248 [67 L.Ed.2d 207, 101 S.Ct. 1089].) As the *Burdine* court stated, the defendant bears only a burden of production, that is, to articulate, but not prove, a nondiscriminatory reason for the adverse employment action. (*Id.* at pp. 256–260.) California courts have adopted this analytical framework for the allocation of the burdens of proof in discrimination cases. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 360–362 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68–69 [105 Cal.Rptr.2d 652].)

Huffman does not dispute that the analytical framework described above is a legally correct one. Instead, he contends that framework applies only in pretext cases, and not in a mixed-motive case such as the one presented here. Huffman asserts that because this case is a mixed-motive case, IBC's business reasons for its actions constituted an affirmative defense, which IBC had the burden to prove. We disagree with both the factual and legal underpinnings of Huffman's argument.

First, the facts do not support Huffman's position. This case was pled and tried as a pretext case, that is, IBC's decision was a pretext for age discrimination. IBC never raised mixed-motive as an affirmative defense and it was never presented to the jury as a mixed-motive case. Rather, Huffman succeeded at trial in convincing the jury that IBC's stated reasons for its decision were not legitimate and the real reason Huffman was demoted was because of his age. Indeed, in closing arguments Huffman's attorney repeatedly cast doubt on IBC's evidence regarding the reasons for Huffman's demotion and asked the jury to find that IBC's reasons were a pretext for age discrimination. Had this been a true mixed-motive case, the employment decision at issue would have resulted from a mixture of illegitimate and legitimate considerations. (*Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 232 [104 L.Ed.2d 268, 109 S.Ct. 1775].) Moreover, neither Huffman nor IBC offered a mixed-motive instruction. Instead, Huffman and IBC offered instructions that set forth the three-part analysis (which included the erroneous second step) of proving through circumstantial evidence that the adverse employment action was a pretext (or single motive) for intentional discrimination.

Second, the law does not support Huffman's position. As discussed, modified BAJI No. 2.60 is not a legally accurate presentation of a mixed-motive affirmative defense. In a true mixed-motive case, such as presented in

---

ruling, the court referred to IBC's counsel's "acquiescence" in permitting the giving of BAJI No. 2.60 as constituting either "a waiver, an estoppel against challenge or invited error."

*Price Waterhouse v. Hopkins*, *supra*, 490 U.S. 228, the plaintiff, Ann Hopkins (Hopkins) had *proved* that gender played a part in the decision to deny her partnership in the accounting firm. (*Id.* at pp. 236–237.) The Supreme Court addressed the question of how to determine if the decision was because of Hopkins's gender if such a decision is based on both legitimate and illegitimate motives.

In such a case, the Supreme Court concluded that an employer may "avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role." (*Price Waterhouse v. Hopkins*, *supra*, 490 U.S. at pp. 244–245, fn. omitted.)[17] Of particular relevance here, in reaching this conclusion, the Supreme Court stated: "[S]ince we hold that the plaintiff retains the burden of persuasion on the issue whether gender played a part in the employment decision, the situation before us is not the one of 'shifting burdens' that we addressed in *Burdine*. Instead, the employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another. [Citation and fn. omitted.]" (*Id.* at p. 246.)

█ Accordingly, even in a mixed-motive case, the burden of persuasion does not shift to the employer to prove its stated legitimate reason for the employment decision. Rather, it limits the employer's liability, once a plaintiff has established an unlawful motive, if the employer can show that it would have taken the same action absent the unlawful motive. The latter inquiry is separate from, and subsequent to, a determination of an unlawful motive. BAJI No. 2.60 does not come close to articulating this affirmative defense.

### 2) *The Error Reversing the Burden of Proof Was Prejudicial*

█ The instructional error here misled the jury. "Article VI, section 13 of the California Constitution provides that error in instructing the jury shall be grounds for reversal only when the reviewing court, 'after an examination of the entire cause, including the evidence,' concludes that the error 'has resulted in a miscarriage of justice.' The test of reversible error has been stated in terms of the likelihood that the improper instruction misled the jury. [Citation.]" (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 490 [286 Cal.Rptr. 40, 816 P.2d 892]; *Mitchell v. Gonzales*, *supra*, 54 Cal.3d at p. 1054; see also

---

[17] Following the *Price Waterhouse* decision, Congress enacted the Civil Rights Act of 1991, which, among other things, overruled that portion of the decision that permitted an employer to avoid liability by proving its affirmative defense. Federal law now provides that liability attaches, but restricts the plaintiff's remedies. (*Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, 94–95 [156 L.Ed.2d 84, 123 S.Ct. 2148].)

*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Thus, if a review of the entire record demonstrates that the improper instruction was so likely to have misled the jury as to become a factor in the verdict, it is prejudicial and a ground for reversal. (*Henderson v. Harnischfeger Corp.*, *supra*, 12 Cal.3d at p. 670.) While there is no precise formula for determining the prejudicial effect of instructional error, we are guided by the five factors enumerated in *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)[18]

 The first factor we consider is the degree of conflict in the evidence on the critical issue at trial, namely the reason for Huffman's demotion. As the trial court acknowledged, this was a close case. There was conflicting evidence on the reasons IBC decided to demote Huffman. Both Laughlin and Cooper testified that Huffman had performance problems. These decision makers testified that they were receiving complaints about Huffman's performance from customers and account managers, and Laughlin himself had observed Huffman's failure to execute bakery promotions. Huffman, however, relied on his sales performance to discredit the explanation for the decision to demote him. The jury, based on the instruction given, believed that IBC had to prove by a preponderance of evidence that the decision makers' reasons for demoting Huffman were both "in good faith" and "for a proper business purpose." Had the jury been informed, however, that IBC did not have the burden of proof, the jury may well have reached a different result.

Second, we consider the emphasis of the erroneous instruction in argument to the jury. Though Huffman's counsel never directly addressed BAJI No. 2.60, and acknowledged that Huffman had the burden to prove age discrimination, Huffman's counsel repeatedly attacked the reasons IBC's witnesses gave for the demotion and accused them of "lying." It is reasonable to conclude that if the jury doubted IBC's witnesses, this would lead them to conclude that IBC had not met its burden of proof. Had the jury been properly instructed, it would have focused on whether Huffman proved that the decision to demote him was because of his age, instead of on whether IBC's proffered reasons for that decision were legitimate ones.

Third, we consider whether the jury asked for a rereading of the erroneous instruction or of related evidence. During deliberations, the jury questioned

---

[18] The Supreme Court in *LeMons* outlined five separate factors that should be considered in order to measure the likelihood of whether the jury had been misled: "(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." (*LeMons v. Regents of University of California*, *supra*, 21 Cal.3d at p. 876.)

the trial court about the instruction on managing agents. From this we infer that had the jury misunderstood the allocation of the burdens of proof, it would have asked for a clarification. Thus, we must assume that they followed the erroneous instruction as given, compounding the prejudice.

Finally, we consider the effect of other instructions in remedying the error.[19] Huffman points to several instructions, none of which cured the error. While special instruction No. 26 set forth the three-part test to establish age discrimination, that instruction did not specifically state the burden of proof. Rather, it stated that once Huffman established a prima facie case of discrimination, "Defendant may show that it had a reason other than Plaintiff's age for the demotion." In light of BAJI No. 2.60, the only way to correlate this special instruction, as IBC suggests, is to conclude that it means "may be able to prove." That is one way to reconcile these instructions. We agree, however, that "may" as used in the special instruction does not signal to the jury that IBC did not have the burden of proof. Special instructions Nos. 27, 28, and 30 are no help because these instructions simply state that it is irrelevant whether the jury agrees or disagrees with IBC's reasons for the demotion and do not specifically address the applicable burden of proof.

Based on the foregoing factors, it is reasonably probable that a result more favorable to IBC would have been reached had the jury been properly instructed on the burden of proof. The trial court's error, therefore, was prejudicial.

### b. *IBC Neither Waived Nor Is Estopped from Asserting Instructional Error*

We reject Huffman's argument that the doctrine of invited error applies here because IBC's counsel withdrew his objection to the erroneous instruction. When an instruction involves a misstatement of the law on the burden of proof, as it does here, we do not view the invited error doctrine as broadly as Huffman does.

It is well settled that there is no waiver for failure to object. Code of Civil Procedure section 647 provides, in pertinent part, that the trial court's "giving an instruction, refusing to give an instruction, or modifying an instruction requested . . . [are] deemed to have been excepted to." (See *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 333–334 [5 Cal.Rptr.2d 594].) As we have stated, "when a trial court gives a

---

[19] We do not address the fourth factor, that is, the closeness of the jury's verdict, because the jury was not polled.

jury instruction which is prejudicially *erroneous as given*, i.e., which is an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal. [Citation.]" (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133].) Thus, because the court's instructions on the burden of proof prejudicially misstated the law, as discussed above, IBC rightfully raised this issue on appeal.

Huffman counters, however, that the situation here is different from a failure to object. He contends that because IBC's counsel acquiesced to the instruction, IBC is estopped from asserting error based on the invited error doctrine. We disagree.

█ The invited error doctrine is based on estoppel. " 'Where a party *by his conduct induces the commission of error*, he is estopped from asserting it as a ground for reversal' on appeal." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79], italics added.)

In support of his argument that acquiescence is sufficient conduct to invoke the invited error doctrine, Huffman cites *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856–857 [176 Cal.Rptr. 239], and *People v. Duty* (1969) 269 Cal.App.2d 97, 105 [74 Cal.Rptr. 606]. Those cases are inapposite because neither involved misstatements of the law, which is at issue here.

█ Instead, we find persuasive *Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 212 [186 Cal.Rptr. 847]. In that case, the plaintiffs withdrew their objection to an improper instruction. The defendant argued that they were estopped from asserting instructional error on appeal. The *Pappert* court disagreed, concluding that the invited error doctrine did not apply. (*Id.* at p. 212, fn. 3.) This is so because the invited error doctrine requires affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party. (See, e.g., *People v. Majors* (1998) 18 Cal.4th 385, 408–409 [75 Cal.Rptr.2d 684, 956 P.2d 1137] [defendant could not challenge failure to give lesser-related offense instruction when defense counsel chose not to give the instruction]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191, fn. 2 [9 Cal.Rptr.2d 834, 832 P.2d 146] [defendant could not challenge his proffered instruction on appeal].) No such tactical choice appears here. IBC's counsel did not request the instruction,[20] nor is there any evidence that he made the tactical choice to permit the

---

[20] We summarily dismiss Huffman's argument that the instructions were jointly requested or that IBC proposed a similar instruction. The first argument appears to be based on the trial court's reliance on cases invoking the invited error doctrine when the challenged instruction

erroneous instruction.[21] Thus, the invited error doctrine does not apply here, and the giving of the erroneous instruction was prejudicial.

## CONCLUSION

We conclude that the trial court applied an incorrect causation standard to IBC's allegedly unlawful age-related demotion of Huffman and admitted evidence of emotional distress that should have been excluded because of the exclusivity provisions of the WCA. The admission of such evidence was prejudicial to IBC. We also conclude that the trial court erroneously instructed the jury that IBC had a burden of proof that the law did not impose. This instructional error was prejudicial to IBC. For these two reasons, IBC is entitled to a new trial on all issues.

## DISPOSITION

For the reasons expressed herein, the judgment is reversed, and the case is remanded for a new trial. IBC is awarded its costs on appeal.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied September 13, 2004, and the petition of appellant Daniel Huffman for review by the Supreme Court was denied January 26, 2005. George, C. J., did not participate therein.

---

was jointly requested. That is not the case here. IBC originally designated BAJI No. 2.60, but, as noted, that is a "fill in the blank" instruction, which Huffman, and Huffman alone, erroneously filled in to shift the evidentiary burden to IBC.

[21] As stated, the trial court appeared to accept IBC's counsel's explanation that he made a mistake. Nevertheless, the trial court invoked contract principles to reason that IBC's counsel had entered into a contract with Huffman's counsel by stating that he had no further objection to the proffered instruction, and that mistake of fact would not be sufficient to void the contract. We do not view the analysis of instructional error to be based on contract principles.