Filed 3/15/24  P. v. Davis CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ROBERT EARL DAVIS, JR.,<br><br>        Defendant and Appellant. | F084930<br><br>(Super. Ct. No. 4006503)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Robert Earl Davis, Jr., argues the trial court erred admitting lyrics from a rap music video, erred admitting evidence Davis possessed a firearm not used in the charged crimes, and that his premeditated attempted murder conviction is not supported by substantial evidence. Davis further argues cumulative error. We reject these arguments and affirm.

## PROCEDURAL HISTORY

On October 27, 2020, the Stanislaus County District Attorney's office filed an amended information charging Davis with first degree murder (Pen. Code,[1] § 187, subd. (a); count 1), and premeditated attempted murder (§ 664/187, subd. (a); count 2.) As to count 1, the information alleged the special circumstance that Davis committed the murder by intentionally discharging a firearm from a motor vehicle, at another person outside the vehicle with the intent to inflict death (§ 192, subd. (a)(21)).

As to both counts, the information further alleged the enhancements that Davis personally and intentionally discharged a firearm and proximately caused great bodily injury or death to another person (§ 12022.53, subd. (d)), and that Davis was released on bail or on his own recognizance pending judgment becoming final on another felony offense, assault with a firearm (§ 12022.1).

The jury found Davis guilty of first degree murder, and intentional, deliberate and premeditated attempted murder. The jury further found true that Davis personally and intentionally discharged a firearm in the commission of both crimes. The jury found not true the special circumstance allegation, and pursuant to the prosecutor's request, the trial court struck the out on bail or own recognizance enhancement allegations.

On September 7, 2022, Davis was sentenced to 25 years to life for the first degree murder conviction (§ 190, subd. (a)), seven years to life for the attempted murder (§ 664,

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

2.

subd. (a); § 3046, subd. (a)), 25 years to life for the personal and intentional discharge of a firearm causing death enhancement (§ 12022.53, subd. (d)), and 20 years for the personal and intentional discharge of a firearm enhancement (§ 12022.53, subd. (c)), for a total of 77 years to life in prison.

On September 7, 2022, Davis filed a timely notice of appeal.

## STATEMENT OF FACTS

On October 28, 2017, D.G., age six, and X.S., age five, were at a party in a home in a cul-de-sac in Modesto. They were playing catch inside the garage, which the family used as a family space, and the garage door was about halfway open.

At some point in the night, a silver-colored Lexus drove into and turned around in the cul-de-sac. Six to eight shots were fired from the Lexus in the direction of the house. One bullet lethally struck X.S. in his shoulder and chest. Shrapnel from either a bullet or shattered glass from a bullet striking a bottle struck D.G.'s left ear. An investigation of the scene revealed the bullets were shot into the middle of the garage, and the shots were level with one another.

Through surveillance video obtained during the investigation, officers identified the Lexus involved in the shooting as belonging to Ryan De Sousa. Officers interviewed De Sousa and identified Devan King and Davis as additional suspects.

De Sousa, pursuant to an agreement with the People, testified at Davis's trial. De Sousa testified that on October 28, 2017, he picked up King and the two smoked weed in De Sousa's car. De Sousa then received a call from Davis, who mentioned that he got robbed of some drugs at work. De Sousa went to pick up Davis at Davis's house. Davis looked like he had something in his shirt and pants, but De Sousa did not initially see what it was.

Davis gave De Sousa an address and directions, and De Sousa started driving there. While they were in the cul-de-sac, Davis told De Sousa to slow down. De Sousa heard the window roll down and the six or seven gunshots. He saw Davis with an AR-

3.

He also saw the garage Davis was shooting into was about halfway open, and there seemed to be two children running inside. De Sousa sped up and drove out of the cul-de-sac. Later he cleaned out his car, throwing away 12 or 13 shell casings and bullets.

King also testified at Davis's trial. He testified that Davis entered the car and when De Sousa began driving, Davis began loading an assault rifle type gun. When shown a still image from a YouTube music video where Davis was depicted holding an assault rifle type gun, King stated "I'm pretty sure that's the gun right there." When they arrived near the victim's house, Davis directed him to roll down the window a bit so the shells from the bullets would not fall outside the car. Davis then fired about eight shots in quick succession toward the victim's house.

## DISCUSSION

### I. The Trial Court Did Not Err Admitting Lyrics From A Rap Music Video

Davis argues that the trial court abused its discretion admitting the lyrics from a rap music video. In the video, Davis was depicted holding different firearms, including one resembling the type of gun used in the drive-by shooting. Davis asserts the issue was preserved for appeal, that recently enacted Evidence Code section 352.2 applies retroactively to the instant case, and that the retroactive application of Evidence Code section 352.2 requires reversal of his convictions. We reject his assertions.

#### A. Background

During motions in limine, the prosecutor sought to introduce a YouTube video published on November 13, 2017, wherein Davis was depicted holding several guns, including, an AR-15 style gun. An AR-15 was used in the commission of the currently charged drive-by shooting.

The prosecutor moved to introduce clips of the video (without audio) to the jury. According to the prosecutor, the video portrayed Davis handling an AR-15 with a pistol grip and removing the magazine, showing that Davis had operational knowledge of the weapon.

Trial counsel objected to admission of the video, solely on the basis that the AR-15 appeared to be a prop. Trial counsel also represented that his expert had viewed the video and opined that it was racially charged. However, counsel asserted, "I didn't really see that myself that it was racially charged, that video. When you see the whole video, maybe there is in some manner, racially charged also."

The prosecutor commented, "in terms of the music video, obviously, there's a lot of cuss words and whatnot. I think we don't need to play that. That's not relevant to this case, and it certainly, if the Court thinks some of this is not relevant or prejudicial, we're okay with just shortening it up to the sections that are relevant to this case." Trial counsel objected again to admission of the video, arguing that there was no evidence Davis ever possessed an AR-15, and that a search of Davis's house failed to yield an AR-15 rifle.

The trial court ruled that the portions of the video where Davis appears to be holding a pistol-grip AR-15 rifle were not more prejudicial than probative and allowed its admission.

The following day, the trial court the parties discussed the music video again:

> "COURT: I've already ruled that you're going to make some – you're going to make brief video portions from the music video depicting [Davis] allegedly with the similar gun but excluding the one with the handgun.
>
> "[PROSECUTOR]: Correct. I'll show everybody the video before it's obviously played or presented to the jury. The other thing I wanted to bring up about the YouTube video is I was just going to present a muted video without the lyrics, but I can keep that in if [the] court and counsel finds that relevant.
>
> "[TRIAL COUNSEL]: The objections I made yesterday were actually to both photos. I think this is the one that was in the prelim, if I'm not mistaken. It's basically the same objection that the AR-15 is very, very common. We don't even know if those are necessarily owned by him or if

5.

they're just props.  It's overly prejudicial in terms of whether it's really relevant to this case….

"I don't know if that was even the same gun that was in the music video.  It's a common gun.  I don't even know if it's – especially in this one.  I can't tell if it's real.

[¶] … [¶]

"The one that we had yesterday it was brought to my attention later I believe at the end of that music video there's a disclaimer saying that the weapons are not real.  It's in the YouTube video.  At some point in time that needs to be brought in.  There's a disclaimer I guess the people that made it said something, these aren't real weapons.  If we can find that, that certainly should be brought in.

[¶] … [¶]

"[PROSECUTOR]:  The other issue though if that statement comes in I would want to play the whole video at that point and show all the guns that are in that video because I think it's pretty obvious that several of those guns have to be real and that they are manipulated.  Magazines are taken out and put back in so I suggest they are real and that would impeach the statement at the end of the video that they aren't.

"[TRIAL COUNSEL]:  Yeah, there's some – actually, I think the single photo is so prejudicial.  You want to bring the whole thing for context to show it is music video.  That's what we want to do anyway to show this is part of a music video and a lot of these are props.  It's something that's made to be on YouTube.

"COURT:  So are you suggesting the jury should view the entire music video?

"[TRIAL COUNSEL]:  Actually, yeah.  The jury may be without some of the lyrics, may be without the music, but I think to show it in context you have to show the whole thing and to have that disclaimer in there that some of the guns are obviously not real.

6.

"COURT:  There are items that may be prejudicial to your client but tactically you think you would like to show the whole thing?

"[TRIAL COUNSEL]:  I think so.

"COURT:  Without music.

"[TRIAL COUNSEL]:  We can decide about the music later on.  I want to show it's a music video.

"COURT:  Okay.  Do you have any objection to the whole video and we'll decide with or without music being shown?

"[PROSECUTOR]:  I have no objection.  I'll get it in for transcription in the event the Court decides or counsel decides we need to play the music.

"COURT:  So I'll modify my decision from yesterday and allow the entire music video to be shown to the jury assuming there's authentication and foundation."

During trial, the prosecutor moved to admit the video and audio into evidence. The court asked trial counsel if he had any objections.  Trial counsel indicated no objection to either the video or audio.

**B.      Legal Standard**

"A trial court has 'considerable discretion' in determining the relevance of evidence.  [Citation.]  Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.  [Citation.]  An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion.  [Citation.]  We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

### C. Analysis

#### 1. *Forfeiture/Invited Error*

" 'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.' [Citation.] ' "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" ' [Citation.] Additionally, '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' " (*People v. McCullough* (2013) 56 Cal.4th 589, 593.)

Here, not only did trial counsel fail to object to the admission of the rap lyrics (the audio), forfeiting his claim of error on appeal, he invited any presumed error from the admission of this evidence. The well-established doctrine of invited error prohibits an appellant from "gaining reversal on appeal because of an error made by the trial court at his behest." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1234, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176.) A party who, by his conduct induces the commission of an error, is estopped from asserting it as a ground for reversal on appeal. (*Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1312.) The doctrine requires affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party. (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 706.) Such affirmative conduct was shown here.

Despite multiple offers by the prosecutor to mute the audio of the YouTube video, trial counsel requested the music video be shown to the jury in its entirety. Trial counsel represented that he wanted to bring in the entire video to provide context and argue the guns were props.

Davis maintains that trial counsel objected to the lyrics, or at least commented that the lyrics had a " 'lot of cuss words' " and were not relevant to the instant case. However, excerpts from the record upon which he relies to support his assertion were

remarks made by the *prosecutor*, not trial counsel. Trial counsel objected to presenting still images from the music video, arguing that the images were prejudicial. Although he initially commented that the video as a whole may be "racially charged," at a subsequent hearing, trial counsel changed his mind. Trial counsel ultimately concluded that even though the video may contain prejudicial elements, his preference was to show the video to the jury in its entirety to argue that the guns were props. The relevance or prejudicial effect of the rap lyrics was never contested.

Davis does not claim that trial counsel was constitutionally ineffective for failing to contest the admissibility of the rap lyrics. We independently observe that the record would not support such a claim. " 'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight.... A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185, quoting *People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Davis relies on *People v. Morris* for the proposition that an evidentiary objection is properly "preserved [on] appeal [when] the issue was thoroughly litigated with a full context during motions in limine." (*People v. Morris* (1991) 53 Cal.3d 152, 189, overruled on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824.) *Morris*, however, says that an objection made during motions in limine may not preserve an evidentiary objection on appeal where events in the trial change the context in which the evidence is offered to an extent that a renewed objection is necessary. (*Morris,* at p. 190.) " '[U]ntil the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility.' " (*Ibid.*)

Here, trial counsel objected to the admission of still frames of the video wherein Davis is depicted holding an AR-15 style gun, as being more prejudicial than probative. At a subsequent hearing, Davis indicated he wanted to bring in the entire video to provide

9.

context and argue the guns were props. Trial counsel acknowledged that some portions of the video may be prejudicial, but he nonetheless elected to show the entire video. The trial court asked whether trial counsel had any objections to the admission of the rap lyrics one final time at trial, prior to the video being shown to the jury. Trial counsel indicated he had no objection.

As cautioned in *Morris*, trial counsel's position on the admissibility of the music video in its entirety evolved between motions in limine and trial. Trial counsel went from being adamantly against showing the video, to using the video as part of his defense strategy. At the time the video was introduced, an objection would have been necessary for the trial court to intelligently rule on the admissibility and prejudicial effect, if any, of the lyrics. (*Morris, supra,* 53 Cal.3d at p. 190.) Instead, trial counsel invited the admission of this evidence. We therefore conclude that any error from the admission of this evidence was invited by trial counsel.

### 2.    *Evidence Code Section 352.2*

Davis further contends that Evidence Code section 352.2, effective January 1, 2023, must be retroactively applied to this case. Evidence Code section 352.2 addresses the admission into evidence of "creative expression," including but not limited to music, performance art and visual art. Evidence Code section 352.2, subdivision (d) provides that the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the jury's presence, and the court "shall state on the record its ruling and its reasons therefor."

There is currently a split of authority regarding whether Assembly Bill No. 2799 (2021-2022 Reg. Sess.) should be deemed retroactive to criminal matters not yet final on appeal. (See *People v. Venable* (2023) 88 Cal.App.5th 445, 456-457 [concluding that Evid. Code, § 352.2 is retroactive], review granted May 17, 2023, S279081; cf. *People v. Ramos* (2023) 90 Cal.App.5th 578, 596 [Evid. Code, § 352.2 does not apply

10.

retroactively], review granted Jul. 12, 2023, S280073.) The issue is presently under review by the California Supreme Court.

Having concluded that trial counsel invited the admission of the rap video lyrics, we need not and do not address whether Evidence Code section 352.2 retroactively applies to the instant case. Trial counsel induced the error, if any, and he is estopped from asserting it as a ground for reversal on appeal.

## II.    The Trial Court Did Not Abuse Its Discretion By Admitting Evidence That Davis Possessed Firearms Not Used In The Charged Crimes

Davis argues the trial court abused its discretion by admitting evidence that a Glock handgun, extended magazine, and ammunition were found in his home after the shooting. Davis argues this evidence was not relevant and was "bad character" evidence, which was substantially more prejudicial than probative. We disagree.

### A.    Background

Davis's home was searched on February 10, 2018, pursuant to a warrant. No AR-15 style gun was recovered, however a Glock 22, .40-caliber handgun, an extended magazine and ammunition was found. The magazine was loaded with silver-colored ammunition. The rap music video published on November 13, 2017, and discussed above, also showed Davis holding a Glock handgun with an extended magazine.

The prosecutor sought to introduce this evidence to refute trial counsel's argument that the guns in the music video were props. Trial counsel objected, and the following exchange took place:

> "[PROSECUTOR]: What I have this afternoon would be Officer Locke. And Officer Locke would testify that he did a search of [Davis's] – the room he rented in a residence. No AR was found, but they found a Glock handgun that looks to be the same gun or similar as the one the defendant is holding in the music video. And I believe we weren't able to

11.

get that in until somebody testified perhaps those guns were fake, and that happened through [Dr.] Turvey.**²**

[¶] … [¶]

"[TRIAL COUNSEL]:  We object to that as overly prejudicial or relevant.  There's no proof that that Glock was the gun that was in the music video either just that it looks similar.  And Dr. Turvey never said it wasn't real.  Presumptive real, but he testified those guns aren't real.

"[PROSECUTOR]:  But it could be proof he has real guns because the insinuation by [Dr.] Turvey was all those guns are fake, and we can't prove the defendant ever possessed a real gun.

"COURT:  I think that's admissible."

Officer John Michael Locke testified that an extended magazine is longer than a standard magazine and would stick out and protrude from where the grip is on the handgun.  After reviewing the music video, Officer Locke opined that the gun Davis was holding in the music video was a Glock.  Officer Locke further observed that the gun in the video had an extended magazine because it protruded past the grip, and the magazine appeared to be loaded with silver ammunition.

**B.    Legal Standard**

Generally, "[w]hen the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed.  There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon.  [Citations.]  When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort

---

**²**  In reference to Dr. Brent Turvey, a forensic criminologist called on behalf of the defense.

12.

of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577, overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631.)

However, when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible. (*People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.) When the gun evidence has some probative value, the question becomes whether, under Evidence Code section 352, the probative value was substantially outweighed by the prejudicial effect of the evidence. (*People v. Sanchez* (2014) 232 Cal.App.4th 197, review granted Mar. 11, 2015, review dismissed Sept. 21, 2016 (*Sanchez*).)

"Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.) We review a trial court's ruling under Evidence Code section 352 for an abuse of discretion. (*People v. Clark* (2011) 52 Cal.4th 856, 893.)

## C.    Analysis

Evidence Code section 1101 provides that, absent one of several exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)

13.

In the case at bench, the prosecutor sought to introduce the evidence of the handguns recovered from Davis's home to rebut Davis's expert's opinion that the guns in the music video were props. Davis owned a real Glock handgun with an extended magazine loaded with silver-colored ammunition and was seen in the music video holding a Glock handgun with an extended magazine loaded with silver-colored ammunition. The jury could reasonably infer the handgun Davis was holding in the music video was the gun recovered from Davis's home and was therefore authentic rather than a prop. The jury could further conclude that the other guns depicted in the music video, in particular the AR-15 style gun Davis was holding, could also be genuine, undermining both the testimony of Davis's expert and his opinion that the music video that the guns were props.

This was ultimately the argument made by the prosecutor in closing argument, who asserted, "we know the search warrant at [Davis's] home revealed a real gun, a Glock that appears to be the same one he used in the video you've all [seen]. And that lends more credibility to the fact that the AR in the video is real too."

The instant case is analogous to *People v. Sanchez* (2014) 232 Cal.App.4th 197 (*Sanchez*). In *Sanchez*, the trial court admitted evidence that a rifle and ammunition, neither of which were linked to the charged offenses, were found in the defendant's bedroom. (*Sanchez,* at p. 226.) The appellate court observed that while the rifle evidence was not relevant to the defendant's commission of any of the charged crimes, it was at least minimally relevant to prove the truth of several gang enhancements and it was relevant to the defendant's credibility. The defendant testified that he never carried a gun. (*Id*. at p. 227.)

Here, as in *Sanchez*, evidence of the fact that handguns were found in Davis's residence were at least minimally relevant to the charged offense. Evidence of the fact that Davis had an authentic Glock in his possession, consistent with one of the firearms he was portrayed with in the music video, supports the inference that this firearm was

authentic.  It further supports the inference that Davis, who was also shown wielding an AR-15 in the music video, probably owned a genuine AR-15—the same firearm used in the drive-by shooting.

We likewise cannot say the handgun evidence was more prejudicial than probative.  (Evid. Code, § 352.)  The evidence was not presented in a way, or for a purpose that might "inflame the emotions of the jury."  (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

Davis argues this case is similar to *People v. Huynh* (2021) 65 Cal.App.5th 969.  There, the prosecution's gang expert testified that "all Asian gangs were extremely violent."  (*Id.* at p. 986.)  The appellate court found the testimony did not have a basis in fact, and "was squarely within the legal definition of prejudice:  it is evidence of little evidentiary impact that evokes an emotional bias."  (*Ibid.*)  In fact, there was no evidence presented that defendant was a member of or associated with a criminal street gang or wanted to join a criminal street gang.  (*Ibid.*)  The evidence was therefore entirely irrelevant.  (*Id.* at p. 987.)

The handgun evidence in this case is not comparable.  The evidence was relevant to a central issue in the case–whether Davis had access to or possessed a real AR-15 style rifle.  It was not presented to impugn Davis's character, but to rebut Davis's expert's opinion.  Because the handgun evidence was relevant to the charged offenses and not substantially more prejudicial than probative, the trial court did not abuse its discretion by admitting it.

### III. Substantial Evidence Supports The Attempted Murder Conviction

Davis challenges his conviction for attempted murder, arguing the jury was improperly instructed on the kill zone theory. We agree that the jury was improperly instructed on the kill zone theory, because there was insufficient evidence of a primary target, but conclude that the error was harmless beyond a reasonable doubt.

### A. Background

Davis was charged with, and convicted of premeditated attempted murder of D.G. The jury was instructed on the elements of attempted murder, as well as the "kill zone" theory of attempted murder:

> "The defendant is charged in Count II with attempted murder. To prove the defendant was guilty of attempted murder, the People must prove that:

> "One, the defendant took at least one direct or ineffective step towards killing another person.

> [¶ ] … [¶ ]

> "And, two, the defendant intended to kill that person.

> "A person may intend to kill a primary target and also a secondary target within the zone of fatal harm or a kill zone. The kill zone is an area in which the defendant used lethal force that was discharged and intended to kill everyone in the area around the primary target.

> "In order to convict the defendant of attempted murder of [D.G.], the People must prove that the defendant not only intended to kill [X.S], but also intended to kill [D.G.] or intended to kill everyone else within the kill zone.

> "In determining whether defendant intended to kill [D.G.], People must prove that:

> "One, the only reasonable conclusion from the defendant's use of lethal force is the defendant intended to create a kill zone.

16.

"And, two, [D.G.] was within the kill zone.

"In determining whether defendant intended to create a kill zone, the scope of such zone … you should consider all the circumstances including but not limited to the following:

"The type of weapon used; the number of shots fired; … distance between the defendant and [D.G.]; the distance between [D.G.] and the primary target."

In closing, the People argued:

"So let's talk about what attempted murder is. Attempted murder has two elements you must find true before you can find the defendant guilty of attempted murder.

"One, defendant took at least one direct or ineffective step towards killing a person. He tried to do something, attempted it and failed. Had he succeeded, it wouldn't be attempt but murder.

"And, two, the defendant intended to kill that person.

[¶ ] … [¶ ]

"Now, I'm not going to spend much time on this. But one of the ways besides seeing somebody and you shoot at them and miss, that's obviously attempted murder if you have intent to kill. But the other way is this idea of kill zone theory…

"If the defendant was shooting into that garage and attempting to kill people in there, essentially under the law he's creating a kill zone. What that means is in addition to the person he killed in there, if he did, he's responsible for anybody else in there for attempted murder if they were in that kill zone and he had this intent to kill…

"An example is I planted a bomb on an airplane because I wanted to kill my worst enemy in life who was on that airplane. And I put that bomb under the seat, and I had this intent to kill. I know it's going to kill everybody else on

17.

the airplane. Say the bomb goes off and kills the guy I'm trying to kill but doesn't kill anybody else.

"Well, everybody on the airplane when the bomb went off is in the kill zone. So under the kill zone theory, everybody on the place that survived can be a victim and could be charged–or the person who planted the bomb can be charged with attempted murder.

"Under kill zone you look at the type of weapon used, we know what was used here, how many shots were fired, was it just one in terms of creating this kill zone, the distance between people and the distance between [D.G.] and the primary target."

## A.      Legal Standard

### 1.      *The Kill Zone Theory*

Generally, "[t]o prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).) "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Ibid.*)

The "kill zone" theory is an extension of this rule. The theory embraces the concept of a concurrent intent to kill, where the nature and scope of the attack directed at a primary victim may raise an inference that the defendant intended to harm the primary victim by harming everyone in that victim's vicinity, thus creating a "kill zone." (*Canizales, supra,* 7 Cal.5th at pp. 602-603.)

Adopted in *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), "the kill zone theory meant that a prosecutor charging attempted murder in a multivictim case had an additional, alternative ground by which to prove the requisite intent to kill. Under appropriate facts, the prosecutor could attempt to show either that the defendant's intent

to kill one or more alleged victims arose independently of his actions toward any other victim, or that the defendant's intent to kill an untargeted victim arose concurrently with his intent to kill a primary target." (*Canizales, supra,* 7 Cal.5th at p. 603.)

Placing a bomb on a commercial airplane intending to kill a primary target, but also ensuring the death of all passengers, or shooting a flurry of bullets into a car with passengers, intending to kill the driver, are both classic examples of attempted murder committed by creating a kill zone. (*Bland, supra,* 28 Cal.4th at pp. 329-331.)

In *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*), the defendant fired a single bullet into a crowd of about 10 people from about 60 feet away. (*Id.* at p. 135.) At trial the jury was given a modified kill zone instruction. (*Id.* at p. 138.) On appeal, this court reversed the conviction, concluding " '[defendant] intended to kill someone but not specifically Joel F. and not everyone in the group.' " (*Id.* at p. 135.) On review, the California Supreme Court considered whether a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. (*Id.* at p. 140.) The high court concluded, yes.

"An indiscriminate would-be killer is just as culpable as one who targets a specific person. One of *Bland's* kill zone examples involved a bomber who places a bomb on a commercial airplane intending to kill a primary target but ensuring the death of all passengers. We explained that the bomber could be convicted of the attempted murder of all the passengers. [Citation.] But a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder." (*Stone, supra,* 46 Cal.4th at p. 140.) " '[I]ntent to kill need not be directed at a specific person….' [Citation.] 'The social harm of murder is the "killing of a human being by another human being." The requisite intent, therefore, is the intent to kill *a*, not a specific, human being.' " (*Id.* at p. 139.)

The *Stone* court did find, however, that the kill zone instruction was given in error based on the facts. (*Stone, supra,* 46 Cal.4th at p. 138.) Nonetheless, the error was

deemed harmless. "We found the instructional error on the theory harmless, however, and upheld the attempted murder conviction, notwithstanding the prosecutor's concession that he had not proved that the defendant specifically intended to kill the victim named in the charging document. In affirming the judgment, we held that a defendant who fires into a group of people intending to kill one of them, but not knowing or caring which one he or she kills, can be convicted of attempted murder because there is no requirement that a defendant intend to kill a specific target, so long as he or she intended to kill someone." (*Canizales, supra,* 7 Cal.5th at p. 604.)

    *Canizales* reaffirmed the reasoning in *Stone,* clarifying "there are evidentiary bases, other than the kill zone theory, on which a fact finder can infer an intent to kill for purposes of attempted murder liability that do not depend on a showing that the defendant had a primary target." (*Canizales, supra,* 7 Cal.5th at p. 608.) "In *Stone*, the intent-to-kill element of the attempted murder charge was established because the evidence supported an inference that the defendant intended to kill *someone* in the group." (*Canizales, supra,* 7 Cal.5th at p. 608.)

### 2.     *Instructional Error*

    "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) The error is one of state law subject to the traditional *Watson*[3] test applicable to such error. (*Guiton*, at p. 1130.)

    "Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred. [Citation.] [¶] In determining whether there was prejudice, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. [Citation.] Furthermore, instruction on

---

[3] *People v. Watson* (1956) 46 Cal.2d 818, 836.

an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict." (*Guiton, supra,* 4 Cal.4th at p. 1130.)

## B. Analysis

We find, that much like in *Stone*, the facts in this case do not support the "kill zone" theory and instructing on CALCRIM No. 600 was therefore error. Nothing in the record shows X.S. was Davis's primary target, and without a primary target, the "kill zone" theory is not applicable. Likewise, while CALCRIM No. 600 directed the jury to determine whether Davis intended to kill X.S. specifically, the People did not argue that X.S. was the primary target, stating in closing instead "[i]f the defendant was shooting into that garage and attempting to kill *people* in there, essentially under the law he's creating a kill zone." (Italics added.) This ambiguity, and the lack of evidence that Davis was targeting X.S. specifically (as opposed to intending to kill anyone or everyone present inside the house or garage) is fatal to the kill zone theory.

Nonetheless, we find the error harmless. The jury was instructed on the elements of attempted murder generally, and the prosecution affirmed this instruction. "One, the defendant took at least one direct or ineffective step towards killing another person. [¶] And, two, the defendant intended to kill that person." The jury was therefore instructed on a valid, factually supported theory of attempted murder, and there was substantial evidence to support that theory.

As discussed in *Canizales* and *Stone*, when firing into the home, Davis did not need to target a specific person, so long as Davis intended to kill *someone*. Davis armed himself with an AR-15 style gun, which he fired seven to eight times into an occupied house. The house's garage was slightly open and children's feet were visible inside, so a jury could reasonably infer that Davis knew the house and garage were occupied. Davis aimed the bullets into the middle of the garage, where the bullets had a higher likelihood

21.

of striking a person, as opposed to toward the roof or toward the ground.  The shots were level, indicating the gun was aimed, and not fired sporadically.  The evidence shows, beyond a reasonable doubt, that Davis intended to kill.[4]

In whole, we cannot say that "it is reasonably probable the result would have been more favorable to the defendant had the error not occurred."  (*Guiton*, *supra*, 4 Cal.4th at p. 1130.)

**IV.     There Was No Cumulative Error**

Davis argues the cumulative effect of the alleged errors deprived him of his constitutional right to due process and a fair trial.

We find no cumulative error and specifically that there were no errors to cumulate. Any objection to the music video lyrics was forfeited at trial when trial counsel failed, on multiple occasions, to object to the introduction of such evidence.  And we find no error in the introduction of the handgun evidence, as it was both relevant to the charged offenses and not more prejudicial than probative.  Finally, although we found the instruction on the kill zone theory was error, as discussed above, the error was harmless.

**DISPOSITION**

The judgment is affirmed.

SMITH, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.

---

[4]  Additionally, Davis was convicted of the first degree, premeditated murder of X.S., which necessarily required the jury to have found Davis harbored an intent to kill when he shot into the garage and house.