Filed 7/9/25  Whithorn v. City of West Covina CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| LARRY WHITHORN, | B332558, B334222 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV08916) |
| v. | |
| CITY OF WEST COVINA, | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from a judgment and an order of the Superior Court of Los Angeles County.  Maurice Leiter, Judge.  Affirmed.

Buchalter, Thomas M. O'Connell, Jennifer M. Misetich and Adam P. Smith for Defendant and Appellant.

Shegerian & Associates, Carney R. Shegerian and Jill McDonell for Plaintiff and Respondent.

—————————————

In 2019, the City of West Covina (City) terminated the employment of Larry Whithorn as its fire chief after 28 years of service, excellent recent performance reviews, and no disciplinary issues. Whithorn brought this action against City; the action went to trial on seven causes of action.

The jury returned verdicts in favor of Whithorn on five of his causes of action: disability discrimination, retaliation, failure to prevent discrimination and retaliation, "whistleblower" retaliation, and intentional infliction of emotional distress. It awarded him $4,145,595 in damages.[1]

City appeals, contending the trial court abused its discretion in excluding evidence of Whithorn's pension benefits; denying its motions for nonsuit and judgment notwithstanding the verdict (JNOV) based on insufficiency of the evidence; and refusing to reduce the attorney fees award to Whithorn. We affirm the judgment.

## BACKGROUND

Whithorn was hired by City Fire Department when he was 21 years old. Over the next 28 years he worked as a firefighter/paramedic, fire engineer, fire captain, assistant chief and chief; in 2014 he was hired as fire chief. As fire chief, Whithorn supervised the department and staff, managed day-to-day operations, acted as a liaison with other departments, maintained the fire department's budget, made presentations to the city council, and oversaw fire suppression, fire prevention and

---

[1] This amount consists of $990,103 in past economic loss; $587,643 in future economic loss; $1,980,206 in past noneconomic loss; and $587,643 in future noneconomic loss.

2

medical response for the community. Managing the budget was particularly challenging because over 90 percent of the budget was devoted to salaries, leaving less than 10 percent of the budget to cover other expenses such as supplies (IVs for paramedics, fuel for vehicles) and vehicle maintenance. At one point, Whithorn was mandated to cut his budget by 10 percent, but 92 percent of his budget was untouchable, so even if he had stopped funding supplies and maintenance, he still could not have achieved the 10 percent cut.

Since at least 2015, City had experienced severe budget issues and a chief cause was its $200 million pension liability. In 2015, the firefighter's union contract with City expired. Until at least 2019, firefighters were working without a contract. The union and City were at odds over everything including salary, benefits, staffing, and working conditions during the entire time Whithorn was fire chief. Matthew Jackson was the union's president during that entire time.

The union's contract negotiations were handled by the union president, union members, and City negotiators. Whithorn was not responsible for those negotiations. Nevertheless, the union pushed Whithorn to advocate on the union's behalf in negotiations. In 2017, the union used a no-confidence vote against Whithorn as a tactic to assist in its negotiations and in likely retribution for a medical leave he had taken. In 2017, city officials dismissed the no-confidence vote as a union tactic, not a true assessment of Whithorn's performance.

City Manager Christopher Freeland, Whithorn's supervisor, testified that he found Whithorn to be an excellent employee, and gave him the highest overall rating on his performance reviews for 2015, 2016, 2017, and 2018. Whithorn

was well-respected by the community and had a good relationship with the chamber of commerce, businesses, community leaders, city staff and council.  Human Resources Director Edward Macias also testified that Whithorn did an exemplary job as fire chief.

In 2017, Whithorn took an extensive seven-month medical leave to address a number of medical issues.  Between January 2017 and when he returned in September 2017, Whithorn underwent four surgeries.  During Whithorn's 2017 medical leave, newly elected City Councilmember Tony Wu expressed concerns to City Manager Freeland multiple times that Whithorn was an "absentee chief," said that the union was upset with his absence, and pressured Freeland multiple times to get rid of Whithorn.  Freeland did not agree to do so.  He told Whithorn about Wu's attempts to fire him.  Freeland thought Whithorn was doing a good job and told Whithorn that his job was secure as long as Freeland was city manager.

In the months following Whithorn's return from leave, Councilmember Wu approached Whithorn at city events and interacted with Whithorn in a way that made Whithorn uneasy.  At one event, Wu said "[Y]ou need to take orders from me. . . . [Y]ou work for me, and change is coming."  Around October 2018, Wu approached Whithorn at a fire prevention open house, pointed to Dario Castellanos and Letty Lopez, and said "that's going to be your new city council.  Get used to it.  Change is coming."

In 2018, city council elections resulted in the election of two new members on the city council, Castellanos and Lopez.  City Manager Freeland viewed their election as giving Councilmember Wu a majority on the city council, effective

4

January 2019.  Wu himself viewed it the same way, telling a local newspaper that he finally got his wish for a majority.

Shortly after the election, Castellanos approached City Manager Freeland about changing the municipal code so the city council and not just the city manager had a say in hiring and firing department heads.  Freeland, Assistant City Manager Nikole Bresciani, and Human Resources Director Macias researched the issue and found "[m]ost cities stay away from having the city council involved in any selection of any city staff other than the city manager," to avoid bringing politics or personal beliefs into the city council.  They recommended against it to Castellanos.  He ordered them to change their recommendation, but they refused, which made him very angry.

Under City Manager Freeland's contract, he could be fired with or without cause by a vote of three members of the city council.  The new majority approached Freeland in March 2019, at or near the end of a 90-day postelection moratorium on termination of the city manager, and told him that he could either resign or be fired.  He chose to resign.

Councilmember Wu then encouraged David Carmany to apply for the city manager position.  Carmany was hired after agreeing in his interview that he was willing to "fire a popular department head."

On March 19, 2019, Whithorn filed a grievance, which included complaints about union president Jackson's and City Planning Commissioner Glenn Kennedy's hostile, harassing, and disparaging public attacks on him.  Bresciani, who became acting city manager after Freeland's departure, received the grievance and found that harassing, discriminatory and/or retaliatory

e-mails targeting Whithorn were coming from City's network but she was not allocated the resources to find the direct source.

On March 11, 2019, Martin Pinon had been hired as City's human resources director for six months. Whithorn asked Pinon about his grievance and Pinon in turn contacted Bresciani; Bresciani said Whithorn would come talk to Pinon. When Pinon met with Whithorn, Whithorn went through his history of medical leaves and his view that the issues involving union president Jackson and City Planning Commissioner Kennedy were due to his medical leaves. Specifically, he believed they were trying to push him out because they believe he was disabled. Pinon viewed Whithorn's complaints as "red flags," and told Whithorn he would move the complaint up the chain of command. Pinon talked to the legal department and City Manager Carmany, strongly recommending they do an investigation. Pinon's recommendation was based on Whithorn's oral statements, not on the written grievance.

On April 2, 2019, Assistant City Manager Bresciani and Human Resources Director Pinon presented Whithorn's hostile work environment claim to the city council with Carmany present. Councilmember Wu's response was "this is fucking bullshit" and he declared the city council was being "bullied" by staff members. Wu refused to remove City Planning Commissioner Kennedy. The city council did not want to investigate the claim, the projected cost of which was $20,000. The city council did not authorize Pinon to investigate and City Manager Carmany terminated him about two weeks later. Carmany said they "couldn't afford [him]" but then approved paying him for three months after he had worked only one and one-half months. Carmany told Bresciani that Pinon was fired

6

because the city council wanted him gone; Bresciani took over human resource responsibilities.

On April 22, 2019, within 17 days of starting as the city manager, and after spending only 30 to 45 minutes interacting with Whithorn, Carmany set up a meeting with and then fired Whithorn, without warning, reprimand or prior discipline. Carmany said City was going in a different direction, but did not give Whithorn a specific reason for his termination.

At trial, City Manager Carmany testified that he based his termination decision upon first person observation of Whithorn and did not rely upon documents or Whithorn's personnel file. This testimony was inconsistent with his discovery responses that he relied on the personnel file in terminating Whithorn.

## DISCUSSION

A. *Whithorn Did Not Open the Door to Other Inadmissible Evidence of His Pension Benefits.*

City contends the trial court abused its discretion when it refused to permit City to introduce evidence of Whithorn's pension benefits. City claims the trial court stated that it would allow the introduction of evidence of Whithorn's pension benefits if he put them at issue. City contends Whithorn put them at issue multiple times during the trial. We read the trial court's initial ruling more narrowly, see nothing in the evidence introduced by Whithorn which violated that ruling and so find no abuse of discretion.[2]

---

[2] In analyzing City's claim of error, we do not consider any remarks made by Whithorn's counsel in opening statements,

7

An evidentiary ruling by a trial court is generally reviewed for abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.) This standard requires the appellant to show that the trial court " 'exceed[ed] the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) The improper exclusion of evidence is grounds for reversal where "the effect of the error or errors . . . complained of resulted in a miscarriage of justice." (Evid. Code, § 354.) "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 692.)

---

primarily because the trial court's ruling was made after opening statements had taken place. In addition, opening statements are not evidence; they are merely an outline of expected evidence. The jury was told it could not use opening statements to make any decision in the case.

Further, we consider only those portions of testimony cited by City in its opening brief under a heading which indicates City contends the testimony concerns emotional distress arising from financial stress, specifically sections P and R under factual and procedural history, and section A under argument. It is not our responsibility to develop arguments for an appellant. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand*).) We do not consider any evidence cited for the first time in City's reply brief on this issue.

The collateral source rule provides "that if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern California Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) The rule "covers payments such as pensions paid to a plaintiff" which "are considered to have been secured by the plaintiff's efforts as part of his employment contract." (*Rotolo Chevrolet v. Superior Court* (2003) 105 Cal.App.4th 242, 245.) Benefits received by a state employee from the California Public Employees' Retirement System is an independent collateral source "even where the state is the tortfeasor." (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 874–875, disapproved on another ground in *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 734.) This is so because the "purpose of the rule is not served by allowing the defendant to escape liability for a wrong merely because the injured party was wise enough to provide for . . . retirement." (*Mize-Kurzman*, at p. 874.) Generally, "jurors should not be told that plaintiff can recover compensation from a collateral source." (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 10.)

The trial court's ruling included two parts. First, pension benefits could not be used as an offset to Whithorn's economic damages. As the trial court added: "But there's a second issue here which is that [Whithorn], at least in their opening statement and as far as I can tell from what I've read in the papers, plans to argue that part of [Whithorn's] emotional distress is that [Whithorn] is worried about his financial security. I think this came up in the opening statement with [Whithorn] having to take

a job at a fast food shop to meet the financial needs of his family. [¶] *I think it would be inappropriate and unfair to allow* [*Whithorn*] *to raise that.* That would then tie the hands of the [City] and preclude them from the fact that he is receiving a pension. [¶] So my ruling is if [Whithorn] in their testimony raises—and it's either in [Whithorn's] testimony or the expert's testimony or in any testimony, *if* [*Whithorn*] *is going to put in evidence or make argument that a part of the emotional distress claim is financial insecurity, that's going to open the door to the introduction of the fact that he's receiving pension benefits.*" (Italics added.)

City first contends that Whithorn put his pension benefits at issue by repeatedly focusing on City's pension liability. We see nothing improper about Whithorn presenting evidence about City's budget issues while he was fire chief. City cites two instances, one of which took up only a few lines of Freeland's testimony, the other two pages of Councilmember Wu's testimony.[3] Both were relevant to other issues. For example, Freeland's explanation of the relationship between salaries and pension liability and the disproportionate role of pension liability in the budget confirmed Whithorn's statement that his job was difficult financially because so much of the fire department's budget was taken up by personnel costs, leaving little for maintenance and supplies. Whithorn's alleged maintenance failures were mentioned by City Manager Carmany to justify Whithorn's termination. It also sheds light on the union's animosity toward Whithorn. Wu's discussion of refinancing

---

[3]     City neglects to mention that Freeland's testimony occurred before the court's in limine ruling.

City's pension liability was interwoven with his discussion of the firefighters' demands for salary increases, which Whithorn contended played a role in the no-confidence vote (also mentioned by Carmany to justify Whithorn's termination). Neither witness in any way referred to Whithorn's pension benefits or a desire to reduce pension liabilities by eliminating firefighters. This testimony in no way put Whithorn's pension benefits at issue.

City next contends Whithorn put his pension benefits at issue when he introduced evidence of his financial insecurity through not only his own testimony, but also the testimony of his daughter.

City contends Whithorn testified that after his termination he was "concerned" about finding a new job and how he was going to financially provide for his family. Whithorn did not use the word concern; he testified that he was "trying to figure out" how he was going to get a new job and provide for his family. We see nothing in this testimony which indicates that Whithorn was suffering emotional distress due to financial insecurity.

City next contends Whithorn discussed his "plight" to find work and how he was "forced" to take a job at Chick-fil-A and started delivering bread "to bring in something to support [his] family." The cited testimony primarily describes Whithorn's job duties helping to deliver bread, then working at Chick-fil-A and then running a bread delivery route. It ends with the following exchange: "Q. Now, how does that job compare to what you held and did for the fire service? [¶] A. There's just no comparison. I mean, I'm grateful to have a job, to bring something in to support my family. [¶] Q. And with the Chick-fil-A job, what position did you hold? [¶] A. Entry level." Whithorn does not use the word "plight" and does not suggest that he was "forced" to take those

11

jobs. Again, we see nothing to indicate emotional distress arising from financial insecurity.

Whithorn's own testimony about his emotional distress, also cited by City, shows that he believed it was related to the loss of status. When asked how he felt after being fired, Whithorn testified: "It's pride swallowing. You know, being the fire chief of the City of West Covina, and I can't even get a fair shot as being assistant chief of [a] one station fire department that's predominantly volunteer. It definitely hurts the ego." His attorney then asked what was going on with him emotionally and he replied: "I felt like I let my family down. I was depressed, sad, lacking interest in doing things, can't sleep, feeling like a failure."

City also contends Whithorn's daughter Rebecca testified how devastating it was for her to see her father go from "putting on a firefighter uniform to putting on a red polo with a Chick-fil-A 'Team Member Larry' tag." We agree with this summary of the testimony, but we see no reference to Whithorn's emotional distress due to financial insecurity here. If anything it concerns his daughter's reaction to Whithorn's loss of prestige.

City further contends Whithorn's treating psychologist Dr. Haya Bahbah testified that Whithorn's "financial stress" was a "large part" of what contributed to his anxiety and depression. The record cite provided by City contains the following question and objection: "Q. Right. I also see on the document that it specifically says, quote, patient began treatment on July 18, 2019, to address concerns of stress/anxiety brought on by being let go from his career, end quote. [¶] Did Mr. Whithorn convey to you at that initial meeting that he was suffering from stress and anxiety as a direct result of his termination?" Defense counsel objected on the ground that it was expert testimony. The trial

12

court ruled that it was hearsay, and the doctor did not answer the question.  Thus, there is no testimony here.

It is not our responsibility to search the record, but we note Whithorn points out that on cross-examination of Dr. Bahbah, City's counsel asked: "Financial stress was a large part of what was contributing to Mr. Whithorn's anxiety and depression symptoms; correct?"  The doctor replied: "Yes."  Defense counsel then stated: "In fact, Mr. Whithorn told you that he had financial stress—" but the court interrupted, "you should move on."  Counsel persisted, asking: "Did Mr. Whithorn ever tell you that he was collecting monthly pension benefits—" but Whithorn's counsel objected.  The trial court then held a sidebar.

We do not see how this testimony assists City.  The trial court's ruling stated that the door to pension benefits would be open if *Whithorn* presented testimony that his emotional stress was due to financial insecurity.  It was City which introduced such evidence.[4]  The ruling was made to protect City, which would be unable to respond to the emotional distress evidence due to the collateral source ban.  If City chose to introduce such evidence of emotional distress based on financial insecurity, it was not entitled to such protection.  We see no abuse of discretion in the trial court's finding during the sidebar that the door had not been opened to evidence of Whithorn's pension.

---

[4]     Astonishingly, City contends in its reply brief that Dr. Bahbah was at fault for failing to answer "No" to City's question.  It not clear whether City is suggesting the doctor made a false statement under oath at trial or that she should have made a false statement under oath.

13

Finally, City turns to two portions of Whithorn's counsel's closing argument, first, the "Taylor Swift" argument. This argument, hypothesizing Swift being forced to give up her microphone and sparkly dresses, clearly refers to emotional distress arising from a loss of status or prestige. We see nothing improper about it.

Second, the "age discrimination claim. Again, similar questions, but the evidence you heard here, the age of 50 a firefighter can retire and get three percent times the number of years of service. They fired him at age 49. For someone like Dave Carmany to come in and say he needs to focus on the finances and stuff like that, this is a way for him to focus on those. Don't let him reach age 50."

The age argument technically does not violate the terms of the trial court's ruling, as it does not mention Whithorn's emotional distress arising from financial insecurity. However, we agree with City that the argument was misleading because it strongly suggests Whithorn would not receive a pension at all because he was fired at age 49.[5] City, however, did not object to the argument. This waives City's claim. (See, e.g., *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 794 (*Cassim*).)

Assuming for the sake of argument that it was not waived, we would see no prejudice to City. We find instructive the trial court's ruling denying City's motion for a mistrial based on this

---

[5] Whithorn would not be able to take his pension until he was 50 years old, and his pension would be 3 percent less than if he had worked until age 50, but that is not what the argument suggests. Such tiny savings would not be a very persuasive motive for termination.

argument.  We agree with the trial court that the jury's verdict in favor of City on the age discrimination claim strongly indicates the jury was not swayed by any improper sympathy for Whithorn on the lost pension issue.  We would also be inclined to find that Whithorn's expert's testimony on economic damages clearly demonstrated to the jury that Whithorn was only seeking lost pay.  The expert testified that Whithorn's lost base pay was $990,103 and his projected lost base pay if he had worked until age 56 was $587,643.  Those are the amounts awarded. Whithorn's expert also provided an estimate of lost base pay if Whithorn worked until age 65.  If the jury believed that Whithorn had lost his pension, they had the option of awarding that amount, thereby providing compensation until he reached Social Security eligibility.  We see no reason to think the jury mistakenly believed it could compensate Whithorn for any lost pension benefits.

Jurors were instructed that what the parties say in closing arguments is not evidence.  We also agree with the trial court that jurors were instructed not to let bias, prejudice or public opinion influence their decision; that their verdict must be based solely on the evidence presented; and that they must "carefully evaluate the evidence and resist any urge to reach a verdict that is influenced by bias" or prejudice.  Jurors are presumed to follow the instructions.  (*Cassim*, *supra*, 33 Cal.4th at p. 803.)  City has not presented any admissible evidence to rebut this presumption. City attempted in the trial court and now attempts on appeal to circumvent this rule by offering evidence of jurors' statements after trial.  We agree with the trial court that these statements reflect jurors' thought process during deliberations and are also hearsay; they are inadmissible.  (*Ovando v. County of Los Angeles*

15

(2008) 159 Cal.App.4th 42, 58 ["Evidence of jurors' internal thought processes ordinarily is not admissible to impeach a verdict"]; *Burns v. 20th Century Ins. Co.* (1992) 9 Cal.App.4th 1666, 1670–1671 [same].) This is well settled law. We do not consider this evidence.

Finally, to the extent City contends that it is reasonably probable that the jury would have awarded lower economic damages if it had known that Whithorn was receiving a pension, City is clearly mistaken. The trial court's order and settled law are clear that pension benefits are a collateral source of income which may not be used to offset economic damages, here lost wages.

B.  *The Trial Court Did Not Abuse Its Discretion in Denying City's Nonsuit and JNOV Motions.*

City contends the trial court erred in denying its motions for nonsuit and JNOV. City contends there was insufficient evidence to support the jury's verdicts as to any of Whithorn's causes of action. We do not agree.

"The court's power to grant a nonsuit or to direct a verdict is particularly analogous to the power to grant a motion for judgment notwithstanding the verdict, since these powers are merely different aspects of the same judicial function and have long been held to be governed by the same rules. [Citations.] In fact, it has been said that the power to grant a judgment notwithstanding the verdict is 'absolutely the same' as the power to grant a nonsuit or to direct a verdict." (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 327.)

" ' " 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that

16

there is no substantial evidence in support.' [Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.]" ' " (*Newland v. County of Los Angeles* (2018) 24 Cal.App.5th 676, 684.)

"[G]iven the constitutional right to jury trial and a policy of judicial economy against willy-nilly disregarding juries' hard work (even, in the case of a motion for nonsuit, the work of the jury in listening to the case up to that point), the basic rules regarding these motions are predictably strict. Conflicts in the evidence are resolved *against* the moving defendant and in favor of the plaintiff; all reasonable inferences to be drawn from the evidence are drawn against the moving defendant and in favor of the plaintiff." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750.)

### 1.   *Mixed-Motives Analysis Applies Here.*

City contends the evidence must be analyzed using the burden-shifting formula of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). Whithorn contends *McDonnell Douglas* does not apply at trial. We agree with City that when *McDonnell Douglas* applies to the facts of a case, the burden-shifting formula is applicable at trial. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–355 (*Guz*).)

The California Supreme Court has made it clear, however, that the traditional *McDonnell Douglas* burden-shifting test was designed for use in cases involving a single motive for the adverse action, that is, in "cases that do not involve mixed motives."

17

(*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214 (*Harris*).) As the Court explained, this "framework . . . presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or legitimate. By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action. In a mixed-motives case, however, there is no single 'true' reason for the employer's action." (*Id*. at p. 215.)

In a mixed-motives case, the employee must show only that "discrimination was a *substantial* motivating factor . . . . [P]roof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the [Fair Employment and Housing Act (FEHA)] and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Harris*, *supra*, 56 Cal.4th at p. 232.)

The verdict form in this case properly guided the jury in assessing whether discrimination or retaliation was a substantial motivating factor in Whithorn's termination in an allegedly mixed-motives case. The verdict form asked if Whithorn's disability, age or grievance was "a substantial motivating reason for the City of West Covina's decision to discharge Larry Whithorn?" The form also asked if City's "stated reason for Larry Whithorn's discharge, i.e., Larry Whithorn's poor leadership and job performance and the Firefighters Association's vote of no confidence, [was] also a substantial motivating reason for the City of West Covina's decision to discharge Larry Whithorn?" Finally, the form asked the jury, "Would the City of West Covina

18

have discharged Larry Whithorn anyway at that time based on his poor leadership and job performance and in response to the Firefighters Association's vote of no confidence, had the City of West Covina not also been substantially motivated by discrimination?"

2. *Whithorn Did Not Admit His Own Case Had No Merit.*

City contends there is insufficient evidence to support the jury's verdict because Whithorn admitted during cross-examination at trial that City terminated him for political reasons completely unrelated to Whithorn's disability or grievance.  We cannot agree.

a. **Trial Testimony**

City relies entirely on the following series of questions and answers:

Defense Counsel: "It was your understanding that Council Member Wu allegedly wanted to terminate you because locals were unhappy with the direction of the [fire] department; correct?"
Whithorn: "Correct."
Defense Counsel: "You believed Council Member Wu allegedly wanted to terminate you because the fire unions were unhappy with you; correct?"
Whithorn: "Correct."
Defense Counsel: "Your contention is that the fire association wasn't happy so they went to Council Member Wu to make a deal to get you terminated; correct?"
Whithorn: "That was conveyed to me, correct."

19

(Omitted question by defense counsel to which objection was sustained.)

Defense Counsel: "Chief Whithorn, it's your belief that the decision to terminate you was made to appease the fire association; correct?"

Whithorn: "That's one of the reasons, correct."

Defense Counsel: "A political decision by Council Member Wu to gain the fire union support in upcoming elections; correct?"

Whithorn: "One of the reasons, right."

Defense Counsel: "Not related to your age, disability, or your grievance?"

Whithorn: "Correct."

We view the evidence in the light most favorable to the verdict, but even without that lens, it is not reasonable to understand Whithorn's testimony as admitting that Councilmember Wu orchestrated Whithorn's firing *solely* for political reasons. Whithorn acknowledges that political reasons were *one* of the reasons he was fired, specifically that the two fire unions were not happy with him and Wu wanted their support. In this context, the only reasonable understanding of the last question and answer is that Whithorn is acknowledging Wu had reasons for firing Whithorn *in addition to* Whithorn's age, disability or grievance.[6]

---

[6] Perhaps Whithorn might also be understood as acknowledging that the fire unions were unhappy with him for reasons unrelated to Whithorn's age, disability or grievance.

As we have just discussed, the fact an employer has mixed reasons for terminating an employee, some permissible and some discriminatory, does not defeat a discrimination claim. In such situations, the employee need only show that "discrimination was a *substantial* motivating factor." (*Harris*, *supra*, 56 Cal.4th at p. 232.)

b. **Pretrial Statements**

City also contends that Whithorn's pretrial statements "acknowledged" that he lacked evidence of discrimination. City contends that Whithorn stated in his deposition that he "lacked any evidence that Carmany took into consideration his disabilities when making the decision to terminate his employment." City has not provided a record cite to support this claim and so has forfeited it.[7] (*United Grand*, *supra*, 36 Cal.App.5th at p. 156.)

City also claims that Whithorn failed to assert in his grievance, filed weeks before his termination, that "City engaged in any conduct prohibited by FEHA but rather made complaints against members of the public and [the union] and expressed concern that he would be terminated based on his support of former City Manager Freeland." This is not an entirely accurate summary of Whithorn's written grievance. Again, we view the evidence in the light most favorable to the verdict. Even without that lens, the record shows that Whithorn clearly stated in his written grievance: "I reserve the right to provide additional information to this complaint as an investigation commences."

---

[7] City cites to a page in the record, which is the caption page for its summary judgment motion.

21

The evidence shows that Whithorn did provide additional oral information to Human Resources Director Pinon.

Human Resources Director Pinon recognized that the written grievance was not fully fleshed out. He told his supervisor, Bresciani: "At the very least we need to take a statement from him and see what the issues are." Pinon testified that when he did meet with Whithorn, Whithorn "went through the whole history of where he had been in terms of his medical issues and that he had been out on disability for a number of months. And he led me to believe that some of the issues that he was [raising] relates to Kennedy and Jackson was because of his disability and because he had been gone out on leave for so long and that he believed that they were trying to push him out because they think he was disabled or that he couldn't do the job anymore." Pinon testified that they also discussed age discrimination and retirement. Whithorn specifically told Pinon that he believed he was being retaliated against for being out on medical leave for so long.

3. *The Trial Court's Ruling Did Not Eliminate Whithorn's Need to Prove Discrimination and Retaliation.*

City next implies that the trial court found only two pieces of substantial evidence to support the jury's disability and retaliation verdicts, both of which showed nothing more than that persons were aware of Whithorn's disability and grievance. The record citation provided by City is to the first page of the trial court's tentative ruling, and is essentially a caption page with no substantive information on it. City's failure to provide a record cite is grounds for waiver. (*United Grand, supra,* 36 Cal.App.5th at p. 156.)

22

City claims that the trial "court directly eliminated the threshold requirement for a *prima facie* claim by effectively holding that the termination of an individual with a known disability is, in and of itself, a circumstance suggesting discriminatory motive." City argues that mere knowledge of a disability by an employer is not substantial evidence of a "circumstance suggest[ing] discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.)

Although it is not our responsibility to search the record, the trial court's actual ruling appears only three pages later and reads as follows: "Defendant mainly asserts Plaintiff could not have been fired because of his disability or grievance because David Carmany, the decisionmaker in Plaintiff's termination, was not aware of Plaintiff's disability or grievances at the time he made the termination decision. In opposition, Plaintiff cites the testimony of HR Director Martin Pinon as conflicting evidence showing Carmany was aware of Plaintiff's disability and grievance. Plaintiff also presented evidence showing that Councilman Wu was aware of Plaintiff's disability and grievance and undertook a long campaign to have Plaintiff's employment terminated. The City Council ultimately approved Carmany's decision. Plaintiff presented substantial evidence to support the verdict."

The trial court's statement is clearly directed at a specific argument made by City, and cannot reasonably be understood as stating that this evidence is the only evidence supporting the jury's disability discrimination verdict. City does not consider the other evidence in the record, much of which was cited in Whithorn's opposition to City's JNOV motion, and discussed during oral argument. Accordingly, we treat as waived City's

23

claim that Whithorn did not make a prima facie case of disability discrimination. (*United Grand*, *supra*, 36 Cal.App.5th at p. 153 [appellant must support his claim with cogent argument and citation to the record; we are not bound to develop his argument for him].)

4. *Sufficient Evidence Supports Disability Discrimination.*

City contends that, assuming Whithorn made a prima facie case of discrimination, once City offered a legitimate nondiscriminatory reason for the decision to terminate Whithorn's employment, the burden shifted back to Whithorn to produce substantial evidence that City's justification for its decision is either untrue or pretextual. City is incorrect.

As we have discussed above, this is a mixed-motives case. If an employee does not establish pretext on the part of the employer (or simply does not dispute the employer's proffered reason is genuine), the employee need only establish that the discriminatory reason was a substantial motivating factor in the employer's decision to terminate. (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1186.) This includes providing evidence of a causal link between the employer's discriminatory animus and the employee's termination. (*Ibid*.)

City does contend that this causal link is missing, specifically Whithorn did not offer evidence that Councilmember Wu held a discriminatory motive against Whithorn based on disability, and Wu influenced City Manager Carmany's decision; Whithorn's "cat's paw" theory required a link between Wu's

24

alleged animus and Carmany's ultimate termination decision.[8] City focuses on evidence showing that Whithorn made his last request for accommodation for his disability in mid-2017, nearly two years before his termination. Carmany was not hired until 2019, and City contends Whithorn offered no rational basis to infer that Carmany considered Whithorn's condition in 2017 when making the ultimate decision to terminate him in 2019.

City has failed to provide any legal authority concerning the requirements of the "cat's paw" theory. It is an appellant's responsibility to present legal authority to support its contentions, and failure to do so is grounds for waiver. (*United Grand*, *supra*, 36 Cal.App.5th at p. 153.) City's omission is not trivial. As Whithorn points out, the "cat's paw" theory does not require a showing that every participant in the discriminatory employment decision had a discriminatory animus. It is sufficient if one significant participant had such animus. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.) Thus, City's argument that City Manager Carmany did not consider Whithorn's disability misses the mark. (*Reeves*, *supra*, 121 Cal.App.4th at p. 100.)

As for Councilmember Wu, the trial court found that Wu "undertook a long campaign to have [Whithorn's] employment terminated." City makes no effort to identify or analyze the evidence underlying this finding, or the related and interwoven attempts by Wu to get City Manager Freeland to fire Whithorn,

---

[8]     A "cat's paw" case is one in which a biased individual passes along negative information about a coworker to an "unbiased" decision maker. (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 112–114 (*Reeves*).)

Wu's work obtaining a majority on the city council, Wu's role in the replacement of Freeland by Carmany or Carmany's almost immediate termination of Whithorn's employment.

As set forth in more detail above, in 2017, Councilmember Wu expressly stated a desire to terminate Whithorn due to Whithorn's medical leave. In 2018, Wu told Whithorn that he needed to take orders from Wu, that change was coming. On one occasion Wu pointed to Castellanos and Lopez, said they were going to be the new city council members and change was coming. After the two were elected, Councilmember Castellanos tried to get the municipal code changed so that council members could fire department heads. When City Manager Freeland resisted, Councilmembers Wu, Castellanos and Lopez forced Freeland to resign. Wu encouraged Carmany to apply for city manager, and Carmany was hired after agreeing that he would be willing to fire a popular department head. Seventeen days later, Carmany fired Whithorn. Carmany falsely claimed he fired Whithorn based on a review of his personnel file, which, " 'tend[s] to suggest that the employer seeks to conceal the real reason for its actions, and this in turn may support an inference that the real reason was unlawful.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 863.) Further, although Carmany had observed Whithorn for less than an hour total, he claimed the termination was based on personal observation of Whithorn. This is more than enough evidence to support an inference that Wu maintained his discriminatory animus against Whithorn for years and caused Carmany to terminate Whithorn's employment.

5.   *There Is Sufficient Evidence of Retaliation.*

In order to establish a prima facie case of retaliation under FEHA, a plaintiff must show: (1) he or she engaged in a

26

"protected activity," (2) defendant subjected him or her to an adverse employment action, and (3) a causal link existed between the protected activity and defendant's action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) City contends Whithorn failed to present substantial evidence supporting either the first or third elements at trial.

An employee engages in "protected activity" if he or she opposes discrimination or other conduct made unlawful by FEHA. (Gov. Code, § 12940.) City contends that Whithorn's March 19, 2019 written grievance does not constitute protected activity because it did not include any allegations that he was harassed, discriminated against, or retaliated against on the basis of his age, disability, or for taking medical leaves of absence, that is, it did not claim City engaged in any conduct prohibited by FEHA.

City's argument focuses entirely on Whithorn's written grievance. City has not cited and we are not aware of, any rule that requires an employee to make a complaint only in writing. As we have discussed above, Whithorn's written grievance clearly indicated that it would be supplemented orally, Human Resources Director Pinon understood the written grievance was not complete, Whithorn elaborated on the grievance in his interview with Pinon, and Whithorn's oral statements included complaints that he was harassed and threatened for taking medical leave. This is more than ample to show that Whithorn engaged in protected activity by opposing conduct that violated FEHA.

City again contends that Whithorn was required to prove that City's stated reasons for termination were pretextual. He was not. Retaliation claims may be brought under a

mixed-motives theory.  (*George v. California Unemployment Ins. Appeals Bd.* (2009) 179 Cal.App.4th 1475, 1492.)  That was the situation here.

City again contends there is no evidence to support that Councilmember Wu held retaliatory animus toward Whithorn, or that Wu influenced City Manager Carmany's decision to terminate Whithorn based on the grievance.

As set forth in more detail above, Councilmember Wu was very clearly angry at Whithorn when Whithorn's grievance was presented to the city council.  Wu described the grievance as "bullshit" and claimed he was being "bullied" by staff members.  Wu, along with other city council members, did not want to pay for an investigation.  When Human Resources Director Pinon pressed for an investigation and provided contact information for an investigator, his contract was terminated four and one-half months early, supposedly for financial reasons, but he was given a three months' severance.  City Manager Carmany told Assistant City Manager Bresciani that the city council wanted Pinon gone.  Five days later, Carmany terminated Whithorn.  This is more than sufficient evidence to support an inference that Wu influenced Carmany's decision based on the grievance.

Even without the above evidence, the proximity of the termination to the grievance, particularly given Whithorn's lengthy employment by City, is strong circumstantial evidence of a causal link.  (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1020 [noting that firing an employee of four years "a few months" after the protected activity has been held to be sufficient circumstantial evidence of a causal link].)

28

6. *City Has Not Shown That There Is Insufficient Evidence to Support the Failure to Prevent Verdict.*

The duty to prevent discrimination or retaliation requires an employer to take immediate corrective action that is reasonably calculated to: (1) end the current harassment; and (2) to deter future harassment. (*M.F. v. Pacific Pearl Hotel Management LLC* (2017) 16 Cal.App.5th 693, 701.) City contends there is no substantial evidence it failed to prevent discrimination.

First, City repeats its claim that the written grievance does not contain allegations of discrimination or retaliation. As we have discussed, Whithorn's oral statements to Human Resources Director Pinon are properly considered part of his grievance and are sufficient.

Second, City contends it had no legal obligation to prevent the conduct that was identified in the grievance. City characterizes Whithorn as complaining that he was being subjected to a hostile work environment based on criticisms of his performance and calls for his termination by City Planning Commissioner Kennedy and the union's then-president Jackson. City contends it had no ability to restrain Kennedy or Jackson from expressing their opinions, outside the scope of any employment relationship with City, and City is therefore not liable for these actions as a matter of law. (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1631.)

Whithorn's written and oral grievances mentioned City Planning Commissioner Kennedy and union president Jackson, as well as broader claims. Kennedy had appeared at the fire station and said he was there to fire Whithorn. This is not a

protected expression of opinion.  Assistant City Manager Bresciani found that harassing, discriminatory and/or retaliatory e-mails targeting Whithorn were coming from City's network. Use of City resources to target Whithorn was certainly expression that City could control.

Third, City contends that it initiated an investigation into Whithorn's complaints and so went beyond its obligations to prevent discrimination and retaliation from occurring.  Assistant City Manager Bresciani stated she was not allocated the resources to find the direct source of the harassing e-mails.  The investigation by City occurred after Whithorn was terminated: it is difficult to understand how a posttermination investigation could prevent discrimination or harassment from occurring as to Whithorn.  Further, the investigation was ended early by the city council.

7. _There Is Sufficient Evidence to Support the FEHA Whistleblower Retaliation Verdict._

City contends that there is insufficient evidence to support this cause of action, but its argument is the same as its claim concerning the more general retaliation claim.  It fails for the same reason.

8. _City Has Failed to Show There Is Insufficient Evidence to Support the Intentional Infliction of Emotional Distress Verdict._

City contends the trial court's ruling on its JNOV motion failed to address City's central argument that any alleged adverse actions against Whithorn arose in the normal course of personnel management, and thus cannot support an intentional infliction of emotional distress claim as a matter of law.  City

30

relied on *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55 (*Janken*) to support this claim. The court in *Janken*, however, merely stated in dicta that "A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged." (*Id.* at p. 80.) *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75 (*Light*), cited by Whithorn, understands *Janken* as finding only that the plaintiff had not alleged " 'outrageous conduct beyond the bounds of human decency.' " (*Id.* at p. 101, fn. 10.)

The *Light* court recognized that "[a] number of California authorities have concluded claims for intentional infliction of emotional distress in the employment context may be asserted where the actionable conduct also forms the basis for a FEHA violation." (*Light*, *supra*, 14 Cal.App.5th at p. 97.) This is because " '[n]either discrimination nor harassment is a normal incident of employment.' " (*Id.* at p. 100.) Thus, a plaintiff "may pursue a claim for intentional infliction of emotional distress in the employment context where the conduct at issue violates FEHA *and also satisfies the elements of the claim*." (*Light*, at p. 101, italics added.) The claim, of course, requires "outrageous conduct beyond the bounds of human decency." (*Janken*, *supra*, 46 Cal.App.4th at p. 80.)

The court in *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908 (*Cornell*) reached a similar conclusion about intentional infliction of emotional distress claims and about *Janken*. "A plaintiff 'may pursue a claim for intentional infliction of emotional distress in the employment context where the conduct at issue violates [the] FEHA *and also satisfies the elements of the claim*.' (*Light*[, *supra*,] 14 Cal.App.5th [at p. 101],

31

italics added.)  Here, we conclude as a matter of law that neither Headley's comments, which were inappropriate but not severe, nor his official actions rise to the level of 'outrageous conduct beyond the bounds of human decency.'  (*Janken*[, *supra*,] 46 Cal.App.4th [at p. 80].)"  (*Cornell*, at pp. 945–946.)

City has made no effort to identify or analyze the full range of conduct alleged by Whithorn.  Accordingly, it has waived the claim that its conduct is not outrageous.  (*United Grand*, *supra*, 36 Cal.App.5th at p. 153.)

C.     *City Has Waived Its Claims Concerning the Attorney Fees Award.*

Whithorn requested a lodestar amount of attorney fees under FEHA (Gov. Code, § 12965, former subd. (b)) for $987,920. In opposing Whithorn's attorney fees motion, City asked the trial court to apportion the award between claims on which Whithorn prevailed and the claims on which he did not prevail.  The trial court declined to do so, stating: "This action revolved around the same course of conduct and the same set of core facts; apportionment is not practicable."  City contends this ruling was an abuse of discretion because "many" of Whithorn's dismissed or unsuccessful claims were completely unrelated to the claims on which he prevailed.  We do not agree.

" 'California law . . . considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees. [Citation.]  "Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims [citation], 'under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success' . . . ."  [Citation.]  The trial court may reduce the amount of the fee award "where a

32

prevailing party plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit." ' " (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 360 (*Gunther*).)

Limited success is determined by a two-factor test. "We first evaluate 'whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he [or she] succeeded." ' [Citation.] 'Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his [or her] successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee.' [Citation.] If the court finds that successful and unsuccessful claims are related, 'the court . . . asks whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." ' [Citation.] 'Where a plaintiff has obtained excellent results, his [or her] attorney should recover a fully compensatory fee.' [Citation.] 'There is no precise formula for making these determinations . . . . The court necessarily has discretion in making this equitable judgment.' " (*Gunther*, *supra*, 72 Cal.App.5th at p. 360.)

To be " 'distinct in all respects' " (*Gunther*, *supra*, 72 Cal.App.5th at p. 360) or unrelated, the " 'claims must be suitable for entirely separate lawsuits.' " (*Id*. at p. 361.) "Conversely, related claims 'will involve a common core of facts or will be based on related legal theories.' " (*Ibid*.) Fees need not be apportioned between these claims. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1251.)

Here, Whithorn originally brought 15 causes of action. Ultimately, he prevailed on five. Whithorn voluntarily dismissed four of his claims for failure to engage in the interactive process,

33

negligent hiring and supervision, negligent infliction of emotional distress, and wrongful termination in violation of public policy. The trial court granted City's motion for summary judgment as to Whithorn's four claims for failure to provide reasonable accommodation, violation of the California Family Rights Act, defamation, and coerced self-publication defamation.

The jury found in favor of City on the age discrimination and firefighter bill of rights causes of action.

Although City contends that "many" of Whithorn's dismissed or unsuccessful claims were completely unrelated to the claims on which he prevailed, City completely fails to support this assertion with any cogent argument or record citations. City has forfeited this claim. (*United Grand*, *supra*, 36 Cal.App.5th at p. 153.)

City also claims Whithorn's attorney fees request was disproportionate in light of the success he achieved. Courts must consider the results obtained relative to the amount of fees sought as part of their discretionary review. Even when facts and claims are related, fees still must reflect the overall level of success achieved. (See, e.g., *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989 (*Chavez*) [" 'a reduced fee award is appropriate when a claimant achieves only limited success' "].)

Strict proportionality to the damages recovered is not required. (*Chavez*, *supra*, 47 Cal.4th at p. 989.) City does not explain how a $4 million recovery is a limited success. Further, City has failed to provide a record of the hearing on the request for attorney fees, and so has forfeited any claim that the dollar amount is excessive or unreasonable. (*Gutierrez v. Chopard USA Ltd.* (2022) 82 Cal.App.5th 383, 392–393.)

## DISPOSITION

The judgment and order are affirmed.  City to pay costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.


We concur:



VIRAMONTES, J.



MATTHEWS, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

35